## N. J. Gendron Lumber Co. *vs.* Great Northern Homes, Inc. & another.[1]

Essex.    May 17, 1979. — October 9, 1979.

Present: Goodman, Perretta, & Kass, JJ.

*Evidence*, Hearsay, Relevancy and materiality. *Commercial Bribery.*
*Guaranty. Consumer Protection Act. Interest.*

In an action for the price of lumber and building materials sold and
delivered to a defendant, there was ample evidence to warrant a
finding that the seller, in making a promotional offering of a trip
to Acapulco, had no intent to influence the defendant's plant
manager to buy from the seller materials he would normally have
ordered from wholesalers; there was no error, therefore, in exclud-
ing an extra judicial statement by the defendant's general manager
to the plant manager that the latter should buy at retail from the
plaintiff only for fill-in orders and only where necessary because of
time considerations. [413-416]
In an action for the price of lumber and building materials sold and
delivered to a defendant, there was sufficient evidence to warrant
a finding that a guaranty by the defendant's corporate parent of the
defendant's debts to the plaintiff covered a debt evidenced by the
defendant's note to a bank which had been indorsed by the plain-
tiff. [416-418]
In an action for the price of lumber and building materials sold and
delivered to a defendant, the judge did not err in directing a verdict
for the plaintiff on the defendant's counterclaim under a New
Hampshire consumer protection statute. [418-419]
In an action for the price of lumber and building materials sold and
delivered to a defendant, the judge did not err in instructing the
jury that they might determine the interest rate which ran on a
defendant's account with the plaintiff by considering the amount
stipulated on the plaintiff's invoices for overdue accounts and the
amount actually charged. [419-420]

---

[1] Rule Industries, Inc.

In an action for the price of lumber and building materials sold and
delivered to a defendant, there was no error in the judge's instruc-
tions as to the criteria governing the scope of a guaranty by the
defendant's corporate parent. [420-421]

CIVIL ACTION commenced in the Superior Court on
January 2, 1975.

The case was tried before *Adams*, J.

*Alan R. Hoffman* for the defendants.

*Maria J. Krokidas* for the plaintiff.

KASS, J. In defense to an action by N. J. Gendron Lum-
ber Co. (Gendron) for the price of lumber and building
materials sold and delivered to Great Northern Homes,
Inc. (Great Northern), the latter claims Gendron sub-
orned a Great Northern plant manager with enticements
of adventure in "Acapulco Magnifico" if he should buy
materials from Gendron in sufficient quantity. Rule In-
dustries, Inc. (Rule), from which Gendron seeks recovery
as a guarantor of Great Northern, sets up the less absorb-
ing, but possibly more challenging, defense that its guar-
anty did not cover a portion of Great Northern's indebted-
ness to Gendron.

A jury returned a verdict for Gendron, on the basis of
which judgments, each in the amount of $7,800 plus
$5,850 in interest thereon, were entered against Great
Northern and Rule. The defendants' appeal rests on
claimed error in: an evidentiary ruling; the denial and
allowance of various motions for directed verdicts by the
plaintiff and the defendants; and jury instructions.

Exhibits and testimony received at trial would have
warranted the jury in finding the following facts.

Gendron sold lumber and other building supplies to
Great Northern from April, 1968, to November, 1973.
From time to time, beginning in February, 1970, Rule,
the corporate parent of Great Northern, guaranteed
Great Northern's obligations to Gendron. The pivotal
guaranty for purposes of this case is one Rule gave on
May 30, 1973, covering "the debts of Great Northern
Homes, Inc. for a period of six (6) months from this date

up to a maximum of twenty-five thousand dollars ($25,000)."

In connection with two comparatively large "special term" orders, Great Northern, acting through its vice president and general manager, Cecil J. Moulton, gave Gendron a promissory note because it was not able to pay cash within ten days of delivery, as special term orders required. The first note, dated May 31, 1973, was paid; the second, dated October 11, 1973, and for $14,004.19, was paid only in part. The mechanics of both notes were that they were payable to the order of the Sanford Trust Company (Gendron's bank) and bore a simultaneous indorsement by Gendron. This device enabled Gendron to have the cash from the loan, although it remained responsible to the bank if Great Northern, as turned out to be the case, should fail to pay the note.

Great Northern suffered reverses and went out of business at the beginning of 1974. Rule, on January 11, 1974, paid $2,500 to Gendron on account of Great Northern's outstanding balance; and on February 6, 1974, Rule wrote to Gendron that it would pay the amount outstanding, $7,833.97, by three checks in the amount of $2,611.32 each, one such check to be delivered in each of the three succeeding months. Rule never delivered those checks.

As to the "Acapulco Adventure," this was a promotion Gendron launched in April, 1972. The promotional means included form letters to its customers, an invitation to cocktails and dinner at which Gendron would introduce its "Great Escape" plan, and literature inviting Gendron's customers to "go to fabulous Acapulco with Gendron's!" The sales strategem was hardly subtle: for a given dollar volume of purchases, customers won a "free" trip to fun and frolic in the sun. Gendron addressed the promotional literature to its customers, i.e., by business name if there was one; not to a particular employee of that customer.

1. *The evidentiary and wrongful inducement issues.* Great Northern's first argument on appeal is that the

trial judge erred in excluding an extra judicial statement (i.e. hearsay) by Moulton to Great Northern's plant manager, Edmund Michalski, to the effect that he should solicit prices from wholesalers before he made purchases and should buy at retail from Gendron only for fill-in orders, and where necessary because of time considerations. Moulton should have been allowed so to testify, Great Northern argues, on the basis of the hearsay exception which allows extra judicial declarations which disclose a person's state of mind. *Shailer* v. *Bumstead,* 99 Mass. 112, 120 (1868). *Shannon* v. *Ramsey,* 288 Mass. 543, 549-550 (1934). *DeRonde* v. *Gaytime Shops, Inc.,* 239 F.2d 735, 739 (2d Cir. 1957). 6 Wigmore, Evidence § 1790 (Chadbourn rev. 1976). Leach & Liacos, Massachusetts Evidence 248-249 (4th ed. 1967). Those citations illustrate the common application of this principle with respect to a statement that sheds light on the *speaker's* mind. What Moulton said to Michalski does not fit into that standard hearsay exception, since it is Michalski's state of mind that Great Northern was trying to illuminate, not that of Moulton. Some authority exists to suggest that a judge has discretion to receive hearsay evidence as to a person's state of mind in the form of what another said to that person, i.e., by what Moulton said to Michalski. Hughes, Evidence § 453 (1961). Cf. *White* v. *White,* 346 Mass. 76, 79 (1963). It is sufficient to observe here that, as events transpired at trial, the judge could properly have excluded the proffered evidence on the ground that it was not relevant, since Great Northern never showed, or attempted to show, that Gendron was aware of any limitation on the purchasing authority of Great Northern's plant manager. If there was error, therefore, it was harmless.

Great Northern has asserted that Gendron, through the "Acapulco Adventure" promotion, wrongfully induced Michalski to buy from Gendron for Great Northern's account. Great Northern has not favored us in its brief with any discussion of what the elements of wrongful inducements are. There are not present in the record

the elements of "commercial bribery," which is the advantage one competitor secures over fellow competitors "by his secret and corrupt dealing with employees or agents of prospective purchasers." *American Distilling Co.* v. *Wisconsin Liquor Co.*, 104 F.2d 582, 585 (7th Cir. 1939). See also Model Penal Code § 224.8 (Proposed Official Draft 1962); Restatement (Second) of Agency § 312 and Comment d (1958). The offense of commercial bribery has also been developed by statute, G. L. c. 271, § 39, in Massachusetts (where the Great Northern principal office was located) and N. H. Rev. Stat. Ann. § 638.7 (1974) in New Hampshire (where a Great Northern manufacturing plant was located). In each instance the pertinent statute requires the offer of a bribe to an employee with the intent that he promote the interests of the person offering the bribe over those of his employer. Cf. *Freedman* v. *United States*, 437 F. Supp. 1252, 1260 (D.C. Ga. 1977); Note, Commercial Bribery: The Need for Legislation in Minnesota, 46 Minn. L. Rev. 599-600 (1962). In the instant case, Gendron attempted no clandestine bonus agreement with Michalski. Rather the "Acapulco Adventure" promotion was attended with maximum drumbeats and song, and the hoopla was disseminated to all of Gendron's customers on a to-whom-it-may-concern basis, not to any individual employee. The secretiveness and intent to suborn, which are essential elements of commercial bribery, were absent in the "Acapulco Adventure."

"Wrongful inducement" may be related to the tort of wrongful interference with contractual relations. The very idea of inducement, however, implies that Gendron, in its promotion, acted for the purpose of bringing about a breach or, at least, acted with reason to know that, if Gendron attained its purpose, a breach of an employee's duty to its employer would result. 1 Harper & James, Torts § 6.10 (1956). See Restatement (Second) of Torts § 766, Comments h, i, and j (1979). The trial judge, therefore, properly instructed the jury that it had to find a purposeful intent by Gendron to influence Michalski to

buy from Gendron materials he would normally have ordered from wholesalers. The jury apparently found that intent lacking. There was ample evidence enabling them so to find.

Indeed, there was evidence enabling the jury to find that Michalski had not been influenced at all in his purchasing decisions by prospects for an "Acapulco Adventure." Of the two major purchases by Great Northern in the year of the Acapulco promotion, one was made before the promotion was announced and the second purchase was made by Moulton rather than Michalski. The aggregate purchases from Gendron by Great Northern during its 1973 fiscal year ($51,243) were certainly more than in its fiscal year 1972 ($21,439), but less than in its fiscal year 1971 ($56,427). Moreover, Moulton testified that he visited the New Hampshire plant twice a week, spoke daily on the phone with Michalski, authorized every Gendron invoice and authorized no payments without having seen Gendron's monthly statement. In view of the absence of any evidence that Gendron had a design to influence Michalski, let alone enjoyed any success in so doing, or that Gendron was aware of any limitations on Michalski's authority to buy materials, the authority of Michalski was never put in issue and the proffered evidence of Moulton's instructions to Michalski was, as we have indicated, of no relevance.

2. *The scope of Rule's guaranty.* The second claim of error is the denial of Rule's motion for a directed verdict as to so much of Gendron's claim as is based on the unpaid balance of the note Great Northern gave to the Sanford Trust Company on October 11, 1973. Rule correctly defines the issue as to the note: whether on November 30, 1973, the date on which the Rule guaranty expired, Great Northern was indebted to Gendron. There was ample evidence to enable the jury so to find. First, there was the text of the guaranty itself, which was broad and unqualified. See *Methuen Constr. Co.* v. *J. & A. Builders, Inc.*, 4 Mass. App. Ct. 397, 402 (1976). To the extent the text of

the guaranty is ambiguous, since Rule was its author, it would be construed as strongly against Rule as the guaranty's sense and meaning would allow. *Clark* v. *Anderson,* 123 Me. 165, 167 (1923).[2] Second, the jury were entitled to infer from the circumstances under which Rule gave the guaranty, i.e., at Gendron's insistence and at the very time when the note device was first employed, that the guaranty covered that part of Great Northern's debt evidenced by the note, as well as Great Northern's open account with Gendron. Third, the scope of the guaranty would properly be viewed in light of the construction which the parties adopted and acted upon. *Rome* v. *Gaunt,* 246 Mass. 82, 93 (1923). Gendron's endorsement of Great Northern's notes to the Sanford Trust Company and Rule's acknowledgment by letter on January 11, 1974, and February 6, 1974, that it was responsible for the balance of the October 11, 1973, note are certainly suggestive that both parties intended Rule's guaranty to cover the note. Nor is there anything to Great Northern's alternative argument that Great Northern's note of October 11, 1973, represented payment on its account with Gendron. It cannot be assumed that a creditor who reduces a trade debt to the form of a note intends to deprive himself of a guaranty covering the primary obligor on the trade debt. *Davis* v. *Parsons,* 157 Mass. 584, 587 (1893). *Spitz* v. *Morse,* 104 Me. 447, 450 (1908). We are also unpersuaded by Rule's position that, since the October 11, 1973, note was to the order of Sanford Trust Company, Gendron had no rights under that note until it paid the bank in 1974; i.e., after the expiration of Rule's guaranty on November 30, 1973. Gendron had immediately indorsed the note and, as an indorser, became liable on the instru-

[2] The parties have agreed to apply Maine law on this point because Maine was the place of making of the contract. *Commissioner of Banks* v. *Chase Securities Corp.,* 298 Mass. 285, 300 (1937). *Molinar* v. *Western Elec. Co.,* 525 F.2d 521, 527 (1st Cir. 1975), cert. denied, 424 U.S. 978 (1976). Maine and Massachusetts law do not, in any event, seem to travel different paths concerning the issues in the case.

ment when Great Northern defaulted on November 12, 1973, a date which fell within the guaranty period. G. L. c. 106, § 3-414(1). Me. Rev. Stat. Ann. tit. 11, § 3-414(1) (1964). *Byers* v. *Franklin Coal Co.*, 106 Mass. 131, 136 (1870). Gendron indorsed the note in order to negotiate it with the bank, not for the purpose of lending its name to Great Northern. Gendron was not, therefore, an accommodation party. G. L. c. 106, § 3-415(1). Me. Rev. Stat. Ann. tit. 11, § 3-415(1) (1964). The judge was right in not directing a verdict in favor of Rule on the question of the guaranty.

3. *Applicability of New Hampshire consumer protection act.* In an amended counterclaim, Great Northern added two counts, based on the Acapulco Adventure, claiming damages under a New Hampshire consumer protection statute. N.H. Rev. Stat. Ann., § 358-A (Supp. 1977).[3] As to these counterclaims the trial judge directed a verdict for Gendron at the conclusion of the evidence. The judge was warranted in concluding that the evidence, which offered no suggestion of special dealing with Michalski by Gendron, did not establish a threshold case that the ",Acapulco Adventure" was unfair or deceptive in the sense that it: (1) was within the penumbra of some common law, statutory, or other established concept of unfairness; (2) was immoral, unethical, oppressive, or unscrupulous; (3) caused substantial injury to Great Northern; (4) was exploitative or inequitable; and (5) was seriously detrimental to consumers or others. These are the standards adopted by the Federal Trade Commission as to what is an unfair practice. 29 Fed. Reg. 8325, 8355 (1964). *PMP Associates, Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). Section 13 of the New Hampshire act, in the same manner as G. L. c. 93A, § 2(*b*), adopts interpreta-

---

[3] This statute resembles G. L. c. 93A, but § 1 of the New Hampshire act may extend it to a larger area of disputes between businesses than our act contemplates. On the view we take of the instant case, it is not necessary to attempt to interpret the reach of the New Hampshire law.

tions of the Federal Trade Commission as to what are unfair and deceptive practices.

Great Northern argues the point that if the judge let the question of wrongful inducement go to the jury, then logically the claims under the New Hampshire consumer protection act should also have gone to the jury, since wrongful inducement would be within the "penumbra of some common law concept." Apart from the fact that it focuses on one of five criteria, the argument states too much because, since the wrongful inducement issue did go to the jury, Great Northern lost nothing by not having the question go to the jury a second time under a different label. Cf. *DiIorio* v. *Tipaldi*, 4 Mass. App. Ct. 640, 646 (1976). The jury failed to find a wrongful inducement and, therefore, Great Northern suffered no prejudice even if it was error to direct a verdict on the New Hampshire consumer protection act issue.

4. *Jury instructions on interest.* The trial judge correctly instructed the jury that it might determine the interest rate which ran on Great Northern's account with Gendron by considering the amount stipulated on all of Gendron's invoices for overdue accounts (two percent per month) and the amount actually charged (one and a half percent per month) as evidenced by Gendron's bills, the amounts paid by Great Northern, and by testimony. An important aid in the interpretation of contracts is the practical construction placed on the agreement by the parties themselves. *Lewiston & Auburn R.R.* v. *Grand Trunk Ry.*, 97 Me. 261, 267 (1903). *New England Foundation Co.* v. *Commonwealth*, 327 Mass. 587, 595 (1951). 4 Williston, Contracts § 623 (3d ed. 1961). Maine, at all times material, provided a legal rate of interest of six percent per annum in the absence of an agreement in writing. The invoices, which provided for two percent per month (i.e. twenty-four percent per annum) on amounts not paid within thirty days were a writing. Such credit charges on the sale of merchandise were not proscribed by any statute. *Maine Merchs. Assn.* v. *Campbell*, 287

A.2d 430, 436 (Me. 1972). It was open to the jury to consider evidence, some in written form, tending to show that the parties agreed to a lesser rate. Rule was bound by Great Northern's contractual obligation. *Merchants Natl. Bank* v. *Stone*, 296 Mass. 243, 251 (1936), and cases cited. The jury were warranted in concluding that the eighteen percent per year applied to so much of Great Northern's debt as had been evidenced by the October 11, 1973, note on the ground, as the judge instructed the jury, that the note was a conditional substitution for Great Northern's open account debt and that when Great Northern defaulted on that note (which, it will be recalled, was to the order of the Sanford Trust Company) on November 12, 1973, leaving Gendron to pay it, the amount represented by the note reverted to the status of trade debt so far as terms were concerned. On the peculiar facts of this case, we cannot say the judge's instruction was in error.

5. *Jury instruction on Rule's liability for Great Northern's debt on the note.* Finally, Rule urges that the judge's instructions to the jury on the scope of Rule's guaranty were inadequate because they did not emphasize that the jury might conclude from the fact that the October 11 note ran to the Sanford Trust Company as payee that the parties intended the note to be beyond the scope of the guaranty covering Great Northern's debt to *Gendron.* This argument is a variation on the theme concerning Rule's assertion that it was entitled to a directed verdict on the note portion of the aggregate debt. We do not find Rule's point persuasive. The judge, in his instructions, called attention to the fact that the note in question was a commitment to pay to the Sanford Trust Company. He then told the jury that it could consider whether the note released Great Northern's debt to Gendron or was a conditional substitution for Great Northern's trade debt, which left the trade debt in effect should the note not be paid. In that connection the judge instructed the jury it could consider the text of the guaranty, book entries

made by the parties, and correspondence between the parties. He also laid out pertinent rules of construction. These instructions adequately advised the jury as to the criteria governing the scope of the guaranty.

*Judgments affirmed.*