**UNIVERSITY BANK AND TRUST CO.,**
Plaintiff, Appellant,

v.

**Elaine D. DUNTON, Defendant,**
Appellee.

**No. 80–1828.**

United States Court of Appeals,
First Circuit.

Argued May 7, 1981.

Decided July 24, 1981.

Maria J. Woodford, Boston, Mass., with whom Moulton & Looney, Boston, Mass., and Janice Burnham, Chestnut Hill, Mass., were on brief, for plaintiff, appellant.

Russell F. Hilliard, Concord, N.H., with whom Upton, Sanders & Smith, Concord, N.H., was on brief, for defendant, appellee.

Before COFFIN, Chief Judge, GIBSON, Senior Circuit Judge,* and BREYER, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

University Bank and Trust Co. appeals the decision of the district court finding Elaine D. Dunton to have been released from liability on her guaranty of a loan made by the bank to her husband and his business firm, Metal Blasting & Coating Company. We affirm the judgment of the district court in this diversity case.

On July 15, 1976, the bank loaned Kimball Dunton and his company $150,000. The day before, Elaine Dunton, the wife of Kimball Dunton,[1] executed a separate guaranty agreement with the bank, guaranteeing the loan. The loan was also secured by Kimball Dunton's personal guaranty and assets of the business firm, including certain equipment and machinery. Later in 1977, the bank made three additional loans to Kimball Dunton and his firm, totalling over $52,000. No additional security for these loans was sought by the bank, nor did the bank notify Elaine Dunton of her husband's increased liability.

---

* Of the Eighth Circuit, sitting by designation.

1. Elaine Dunton has been separated from Kimball Dunton for a period of approximately twenty years. Kimball Dunton, however, continues to provide for her support.

Ultimately, the four loans went into default and the bank seized the tangible collateral. The bank recovered over $85,000 through its foreclosure on the assets. The bank, however, applied this amount to reducing the indebtedness due on the three loans made subsequent to the original loan which had been guaranteed by Elaine Dunton.

The bank filed suit against Elaine Dunton for $187,000 after she refused its demand for payment under the guaranty. The district court, on November 18, 1980, after an evidentiary hearing, held that Elaine Dunton's liability under the guaranty had been released because of the bank's impairment of the tangible collateral without notice to her.

■ Initially, the bank argues that the district court erred in finding Elaine Dunton to be an accommodation maker under the Uniform Commercial Code as adopted in Massachusetts.[2] *See* Mass.Gen.Laws Ann. ch. 106, § 3–415 (West 1958). We agree that Elaine Dunton was not technically an accommodation party under the meaning of Article 3 of the U.C.C. In order to be an accommodation party, the individual must sign the negotiable instrument or promissory note itself. Elaine Dunton signed a separate guaranty contract. The promissory note, signed by Kimball Dunton and his business firm, contains no provision for an accommodation party nor any reference to Elaine Dunton's separate guaranty. Article 3, therefore, does not apply to this guaranty.[3] *See National Bank of Detroit v. Alford*, 65 Mich.App. 634, 635–637, 237 N.W.2d 592, 593 (1975).

Whether Elaine Dunton's liability under the guaranty was released because of the alleged impairment of the tangible collateral without notice to her is to be determined by reference to Massachusetts common law. In *Museum of Fine Arts v. American Bond-*

*ing Co.*, 211 Mass. 124, 127–28, 97 N.E. 633, 634 (1912), the Supreme Judicial Court of Massachusetts summarized the common-law duties between the guarantor and the creditor:

The general principles of law applicable to such a contention are well settled. If the agreement between the [creditor] and [the debtor], for the due performance of which by [debtor] the [guarantors] severally bound themselves as sureties, was materially changed by the action of the [creditor] and [the debtor] without the knowledge and consent of the [guarantors], they would be discharged from any further liability. *Warren v. Lyons*, 152 Mass. 310, 312, 25 N.E. 721, 9 L.R.A. 353; *Germania Fire Ins. Co. v. Lange*, 193 Mass. 67, 69, 78 N.E. 746. If without such change the [creditor] gave up or parted with any security which it had from [the debtor], or any means of payment to which under its contract it was entitled for the satisfaction of whatever demand might accrue to it against him by virtue of the contract between them or any right which otherwise would have been available to the [guarantors] as an indemnity or a protection to diminish their loss under their respective contracts of suretyship, then their liability would be diminished to the extent of what was thus parted with. They would not be wholly discharged unless the value of what had been given up equaled the total amount of their liability; but they would be relieved pro tanto. *Guild v. Butler*, 127 Mass. 386; *St. John's College v. Aetna Indemnity Co.*, 201 N.Y. 335, 94 N.E. 994.

The district court in the present case found that the Bank's application of the tangible collateral to the three unguaranteed loans "was not a 'substitution, exchange or release of collateral' [to which defendant assented in the executed guaran-

---

2. In this diversity case, the district court held that New Hampshire, the forum state, would apply Massachusetts law. *See Klaxon Co. v. Stentnor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Neither party appeals this aspect of the decision.

3. At oral argument appellant conceded that whether Mrs. Dunton was properly characterized as an accommodation party was of no consequence, for traditional principles governing the obligations of a guarantor would apply here in any event.

tee] but rather a clear diversion of same from the note which defendant guarantied to other obligations not within her contemplation." The guaranty contract signed by Elaine Dunton contains the following limitation, typed onto the form contract:

> This guaranty is limited to a note, or notes, aggregating $150,000, dated 7/15/1976, and it is expressly understood that this guaranty shall terminate and become ineffective when the principal sum of such notes is reduced to a remaining balance of $100,000.

The bank argues, however, that the contract contained no limitation, express or implied, that it must first apply the proceeds of the tangible collateral to the guaranteed loan. In addition, the bank contends that the case law also does not so require. Appellant's brief at 11–12. We disagree. The typewritten limitation implies that payments on the loan will be first applied against the guaranty.

The collateral pledged for the guaranteed note, according to the security agreement between the bank and Kimball Dunton, was to be applied to that particular note. The agreement reads that the collateral was "* * * to secure payment of the Total of Payments as evidenced hereby and by the note(s), if any, of even date herewith and also any and all liabilities of Debtor to Secured Party *under this agreement or said Note(s)* or any renewals or extensions thereof * * *." (Emphasis added.) Obviously the parties intended that the tangible collateral was to be applied to this loan without diminution in value, although substitution under the guaranty agreement would be allowed.

The *Museum of Fine Arts* case, quoted above, also clearly provides that (1) if the creditor materially changes the terms of the original agreement the guarantor is discharged, and (2) if no such change is made, but if the creditor uses the tangible collateral for purposes other than paying off the guaranteed debt, then the guaranty is reduced by that amount. The present case fits both of these categories.

■ First, the bank impaired the original guaranty contract by making the three additional loans to Kimball Dunton without notifying Elaine Dunton.[4] Second, the bank applied the proceeds of the tangible collateral to the three subsequent unguaranteed loans rather than to the guaranteed loan. The district court found that if the tangible collateral had been properly applied, the principal amount of the loan would have been less than $100,000.[5] Under both of these circumstances, Elaine Dunton's obligation under the guaranty was discharged.

*Affirmed.*

4. The bank apparently argues that language contained in the printed portion of the form contract allowed it to make future loans to Kimball Dunton without any notification to Elaine Dunton. The guaranty by Elaine Dunton would therefore have to be construed as an unconditional one. *See Provident Co-operative Bank v. James Talcott, Inc.*, 358 Mass. 180, 191–93, 260 N.E.2d 903, 910–11 (1970); *see e. g., Victory Highway Village, Inc. v. Weaver*, 634 F.2d 1099, 1102 (8th Cir. 1980). The district court, however, construed the typewritten provision plus the printed portions to be ambiguous. The court stated: "Clearly the language in the guaranty herein relied upon by [plaintiff] is not sufficiently clear to put defendant on notice that the security for her guaranty was to be used to pay off subsequent and unsecured notes of MBC [Metal Blasting & Coating]." We agree. *See N. J. Gendron Lumber Co. v.*

*Great Northern Homes, Inc.*, 8 Mass.App. 411, 395 N.E.2d 457, 462 (1979) (to the extent guaranty is ambiguous, it will be construed against the author) (applying Maine law but finding Massachusetts law in accord).

5. The bank contends that the collection costs raised the amount owing on the loan to over $100,000 after allocation of the tangible collateral. The bank lists large payments of rents and insurance it made as collection costs. We find that the district court's factual findings imply that such large payments were not proper. If anything, the rent payments appear to be liabilities of Kimball Dunton's firm and not of the bank. In any event, since we also find Elaine Dunton discharged under the first situation described in *Museum of Fine Arts, supra,* we need not address this question further.