In re **THE DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**INDIAN MOTOCYCLE ASSOCIATES, INC., Appellant,**

v.

The **DREXEL BURNHAM LAMBERT GROUP, INC., et al., Appellees.**

No. 90 Civ. 6954(MP), Bankruptcy No. 90 B 10421(FGC) and No. 93 Civ. 2747(MP).

United States District Court, S.D. New York.

July 13, 1993.

Howard Simon, Amy Heath, Brauner Baron Rosenzweig & Klein, New York City, for appellant Indian Motorcycle Associates, Inc.

Peter Gruenberger, Howard Spierer, Weil Gotshal & Manges, New York City, for appellee Drexel Burnham Lambert Group, Inc., et al.

## *OPINION*

MILTON POLLACK, Senior District Judge:

Appellant Indian Motocycle Associates, Inc. ("IMA") appeals from the denial of leave to file a claim after the bar date for filing claims on a guaranty of payment made prior to its bankruptcy by a Debtor in bankruptcy reorganization. The Bankruptcy Court, Francis G. Conrad, B.J., found that the applicant was a known creditor prior to the bankruptcy and had not been sent notice of the bar date. The Court on examination of the claim ascertained that the underlying Agreement which was guaranteed had been materially modified without the guarantor's consent before the order fixing the date for notice and barring

of claims and ruled that the modification had terminated the guarantor's obligations and in any event that the claim was barred by the equitable doctrine of laches and accordingly denied the application to file the claim.

**Affirmed.**

## I. BACKGROUND

Appellant IMA's purported claim arises out of a Limited Partnership Agreement (the "Agreement") and related subscription agreement, both dated May 23, 1989. Parties to these agreements were IMA and a wholly-owned Drexel subsidiary called IM Rehab, Inc. ("Rehab"). The limited partnership was created to build low-income housing in Springfield, Massachusetts. In conjunction with the Agreement, Rehab executed a promissory note to IMA, setting out its capital contribution obligations under the Agreement. The Agreement designated IMA as managing general partner and Rehab as limited partner.

On the same date as execution of the Agreement and promissory note, Drexel executed an unconditional guaranty of Rehab's obligations (the "Guaranty"). Section Three of the Guaranty provides:

> No amendment, modification, or supplement to or waiver of any provision of the Subscription Agreement or this Drexel Guaranty Agreement, nor any consent to any departure by IM Rehab thereto, or by the Subscriber Guarantor herefrom, shall in any event be effective unless the same shall be in writing and signed by or consented to on behalf of the Subscriber Guarantor, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

The Drexel Guaranty and the Agreement were both signed by the same individual, Mr. Frank Lenti. Lenti signed the Agreement as President of Rehab, and signed the Drexel Guaranty as Assistant Secretary of Drexel. Drexel and Rehab were listed at the same address in the two contracts, and each entity listed Lenti as the person to receive partnership notices.

On May 23, 1990, the parties to the Agreement, IMA and Rehab, negotiated and executed a series of changes amending the Agreement (the "Amendment") which served importantly to modify Rehab's schedule of payments due to the partnership.[1] The Amendment was negotiated by Lenti, but signed by another officer of Rehab. Drexel, the guarantor, was neither invited to participate in these negotiations, consulted regarding the Amendment, nor requested to sign or issue any consent to the Amendment.

At the time of the Amendment, Drexel was already in bankruptcy, having filed for chapter 11 protection on February 13, 1990. Shortly thereafter, on July 23, 1990, the Bankruptcy Court filed an order directing notice of and fixing a November 15, 1990 bar date for all claims against the Drexel estate. By August 15, 1990, Drexel filed its required schedules of liabilities and lists of all creditors and equity holders to whom notice was sent. Appellant Rehab was neither listed as a creditor on these schedules nor sent mailed notice of the bar date.

Rehab paid the capital contributions and the first two installments required under the Agreement and its Amendment of May 23, 1990, and then failed to make any further payments. Rehab's first default in a scheduled payment occurred on October 23, 1990. At that time however, IMA took no steps to compel payment from Rehab or Drexel, and did not inform Drexel of the default. Rehab did not remedy any of the defaults. The first notice of default was sent by IMA to Rehab and Drexel on April 7, 1992. Drexel's plan of reorganization was by then completed and was consummated on April 30, 1992. IMA had knowl-

---

**1.** The Amendment papers contain a series of revisions to the Agreement, the most significant stating: "IM Rehab has agreed to pay the Second Installment of its Capital Contribution to the Partnership in an amount equal to $94,954 and to make advance payments of certain future Installments of its Capital Contribution in an amount equal to $327,682 (the "Advance Capital Contribution") and to revise the Partnership Agreement to reflect the Advance Capital Contribution; ..."

edge of the Drexel bankruptcy at least as early as April 1991,[2] and admitted knowledge in May, 1992 of existence of the bar date. However, IMA waited a further six months, until November 25, 1992, before filing a motion in bankruptcy court for leave to file a late proof of claim against Drexel as guarantor. Their purported claim seeks $3,285,220 as payment due under the Guaranty.

The Bankruptcy Court held a hearing on IMA's application on January 4, 1993. On February 19, 1993, the Bankruptcy Court issued a memorandum decision (the "Opinion") on IMA's application to file a late proof of claim. *See In re Drexel Burnham Group, Inc.*, 151 B.R. 674 (Bankr. S.D.N.Y.1993). In its Opinion, the Bankruptcy Court engaged in a two-part analysis of IMA's application. In the first part of its analysis, without touching on IMA's breach of the guaranty obligation by its modification of the underlying agreement without the consent of Drexel, the Court first dealt with the standard obligation of a bankrupt to give actual notice of a bar date to known creditors. The Court stated:

> When comparing a guaranty to any other contract in which a debtor is a party, we conclude that the obligation under an unconditional guaranty puts the guarantor on continuing notice that a continuing claim exists for the payment of a debt. Our conclusion is based on the simple fact that an unconditional guaranty, by its very nature, notifies the guarantor that a debt may owing at some later date.... We conclude that on the admittedly slippery slope between certainty and metaphysical possibility, an unconditional guaranty evidences a known contingent claim as defined under bankruptcy law ...

> Under the particular facts of this application, we hold that Claimant's status as a beneficiary of an unconditional guaranty

rendered it a known creditor entitled to actual notice of the bar date.

*Drexel*, 151 B.R. at 682.

The Bankruptcy Court then addressed the merits of the attempted claim and ruled thereon that the failure to obtain Drexel's written consent, as stipulated by the Guaranty, to the May 23, 1990 modifications of the obligation guaranteed, discharged Drexel of its .obligations as guarantor:

> As a general rule, any material or substantial alteration of the terms of the contract made after execution of the guaranty agreement discharges the guarantor unless the guarantor consents to the modification. *See University Bank and Trust Co. v. Dunton*, 655 F.2d 23, 24 (1st Cir.1981) ... According to the facts of this dispute, Debtor neither knew nor consented to the modification of the partnership agreement. We agree with Debtor that the modifications found in the agreement were substantial and material. Debtor is, as a matter of law, released from its obligations under the guaranty agreement.

*Drexel*, 151 B.R. at 683. The Court consequently held that Drexel's discharge from the Guaranty extinguished IMA's claim and therefore obviated any need for Drexel to provide notice of the bar date.

As alternative grounds for disposing of the action, the Bankruptcy Court additionally determined that IMA was guilty of laches for its undue delay in applying to file a late claim:

> [U]nder the principle of laches, Claimant has waived its right to collect under the guaranty agreement because Claimant neglected to pursue its rights in a timely fashion.... In the Second Circuit, the laches doctrine considers the following factors: (1) proof of delay in asserting a claim despite the opportunity to do so, (2) lack of knowledge on the defendant's part that a claim would be asserted, and (3) prejudice to the defendant by the allowance of the claim. *Rapf v. Suffolk*

---

**2.** By letter dated April 23, 1991, IMA received constructive notice from Drexel's inside counsel Karen Cullen that Drexel could not be named as a defendant in a lawsuit unrelated to the present

case because the Bankruptcy Code's automatic stay provision precluded proceedings against Drexel outside the Bankruptcy Court.

*County of New York*, 755 F.2d 282, 292 (2d Cir.1985).

The two-year delay between the time that Claimant first became aware of IMR's default and Claimant's demand for payment from the Debtor evidences Claimant's neglect in enforcing its right, if any, to payment under the guaranty agreement. Even with general knowledge of Debtor's bankruptcy [4], Claimant failed without excuse to undertake any action that would preserve its right under the guaranty, such as filing a protective proof of claim. Allowing claimant to file a late proof of claim would substantially prejudice Debtor's attempts to pay claims according to the plan reorganization and would frustrate the administrative goals of the bar date....

Claimant's failure to pursue its rights, coupled with the resulting prejudice to Debtor, necessitates invocation of our equitable powers. We hold that Claimant's claim under the guaranty agreement is time-barred by laches.

(footnote omitted) *Drexel*, 151 B.R. at 683–684.

On March 5, 1993 the Bankruptcy Court issued an order providing that:

WHEREAS ... the Court having found that the Guaranty was unenforceable because (i) the underlying partnership agreement had been modified without Group's consent, and (ii) IMA's claim under the Guaranty was time-barred by the doctrine of laches; it is hereby

ORDERED that IMA's claim against the Debtors under the Guaranty is disallowed.

On March 16, 1993, IMA filed its notice of appeal of the Bankruptcy Court's order disallowing its claim.

## II. ANALYSIS

■ Our review is directed to the Bankruptcy Court's determination that Drexel's guaranty was discharged by the unconsented amendment of the Agreement, and to the ancillary ruling that the claim was at all events subject to the equitable bar of laches. We review the Bankruptcy Court's rulings of law *de novo*, and its findings of fact under a clearly erroneous standard. *See In re PCH Assoc.*, 949 F.2d 585, 597 (2d Cir.1991); Federal Rule of Bankruptcy Procedure 8013 (imposing clearly erroneous standard for bankruptcy court's findings of fact).

### A. *Drexel's Obligations Under the Guaranty Were Terminated by Amendment:*

Both Drexel and IMA accept the general proposition cited by the Opinion that "[a]s a general rule, any material or substantial alteration of the terms of the contract made after execution of the guaranty agreement discharges the guarantor unless the guarantor consents to the modification." *Drexel*, 151 B.R. at 683. This principle is well-established under the common law of Massachusetts, which by contractual stipulation governs both the Agreement and the Guaranty. *See University Bank and Trust Co. v. Dunton*, 655 F.2d 23, 24 (1st Cir.1981) (summarizing Massachusetts law regarding effect of amendment on a guaranty).

■ Although IMA accepts this general rule, it contends that this rule does not apply to the present case, because Drexel's assent to the Amendment must be implied through the ongoing participation of Drexel's officer Mr. Lenti in the negotiation and execution of the modifications. As noted earlier, Lenti negotiated the Amendment on behalf of Rehab. IMA maintains that by virtue of Lenti's position as both President of Rehab and Assistant Secretary of Drexel, Drexel had actual knowledge of and must be deemed to have consented to the change in Rehab's obligations regardless of whether Drexel ever received formal notice or provided formal consent to the modifications. IMA cites several cases in which a court construed a guarantor's implied or constructive consent where the guarantor had clear and actual knowledge of the amendment by virtue of involvement in the negotiation. *See Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 390 N.Y.S.2d 622 (2d Dep't 1977) ("the only way the contract with the corporation could have been modi-

fied would have been with their consent, since they were the only stockholders and officers of the corporation."); *Firstsouth, F.A. v. LaSalle Nat'l Bank,* 699 F.Supp. 1248, 1251 (N.D.Ill.1988) ("it has long been settled that a guarantor is not discharged where the guarantor has knowledge of and assents, either expressly or *by implication,* to such change." (emphasis added)); *In re IMFC Fin. Corp.,* 11 B.R. 874, 877 (Bankr.S.D.N.Y.1981) ("[i]t is an inevitable conclusion that the same people, the defendants, ... cannot possibly claim that they did not possess the same knowledge when they acted as members of the IMFC board as when they acted as guarantors of Graphic's debts."). IMA submits that in accordance with these precedents, Lenti's authority as an officer of Drexel cloaked him with the capacity to imply Drexel's consent, overriding the stipulated requirement of a written manifestation thereof, even though Lenti was technically negotiating only as an officer of Rehab.

■ IMA's contention fails because it is premised entirely on Lenti's capacity to independently consent for Drexel as one of its corporate officers. At the time of execution of the modifications, Lenti was devoid of authority to act for Drexel with respect to a guaranty because Drexel was then in *custodia legis.* Under 11 U.S.C. § 363(c)(1), the officers of a corporation, as trustees of the estate, are limited to "enter into transactions ... in the ordinary course of business." In matters outside the ordinary course of business, notice to a trustee or creditors and bankruptcy court approval are required before a transaction such as entering into a guaranty of another's debt may bind the debtor. *See In re Selgar Realty Corp.,* 85 B.R. 235, 240 (Bankr. E.D.N.Y.1988) ("where these goals [of § 363] are not furthered, a debtor should first seek order from the court before engaging in any transaction.")

■ Consent to a modification of the obligations of a bankrupt debtor falls outside the scope of the ordinary course of business transactions under the test developed by the federal courts. Courts generally have applied a two-part test to determine whether a transaction is in the ordinary course of business. In the first part of this test, the "vertical dimension" test, the court analyzes the transactions "from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted" when he initially contracted with the debtor. *In re Dant & Russell, Inc.,* 853 F.2d 700, 705 (9th Cir.1988) (quoting *In re Johns–Manville Corp.,* 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986), *rev'd on other grounds,* 801 F.2d 60 (2d Cir.1986)); *see also In re Roth American, Inc.,* 975 F.2d 949, 952–953 (3d Cir.1992) (same). In the second part of the analysis, the "horizontal dimension" test, the court must determine "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *In re Dant & Russell,* 853 F.2d at 704; *see also In re Roth American,* 975 F.2d at 953 (same); *In re Johns–Manville,* 60 B.R. at 618. Under this two-part analysis, "[t]he touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *In re James A. Phillips, Inc.,* 29 B.R. 391, 394 (S.D.N.Y.1983).

■ In the present case, a hypothetical creditor could not reasonably expect a debtor in Drexel's position to tacitly acquiesce to modifications of a guaranteed obligation without either formal notice of the change or consideration. The modifications went to the heart of the arrangement; they modified the payment provisions of the Agreement underlying Drexel's unconditional guaranty. It is beyond reason that a guarantor's consent to such a modification in the manner suggested would constitute a transaction in the "ordinary course of business." Impliedly affirming the Amendment and thus changing the debtor's potential liability under the Guaranty would both alter the economic risks accepted by other creditors, and, under the circumstances, stand outside the realm of transactions conducted by similar businesses. Thus, under both the vertical and horizontal dimensions

of the two-part test, consent to the Amendment of the obligation guaranteed was a transaction outside of Drexel's "ordinary course of business." Lenti did not have authority, either actual or apparent, to consent on behalf of the bankrupt Debtor to amendment of the Agreement guaranteed without prior sanction of the Bankruptcy Court. *See In re Selgar Realty*, 85 B.R. at 240. The unconsented modifications to the guaranteed obligation forthwith terminated Drexel's obligations under the Guaranty and Drexel had no obligation to provide IMA thereafter with the notice of the bar date ordered after the modifications voiding the guaranty were already made.[3]

B. *IMA's Claim Is Barred by Laches:*

While the foregoing sufficiently disposes of the appeal, for the sake of completeness, we shall deal with the alternative ground for the dismissal below, the bar of the claim by the equitable doctrine of laches.

In addition to holding Drexel discharged from its guaranty, the Bankruptcy Court also ruled that IMA's claim was barred by the equitable doctrine of laches. The doctrine of laches "asks whether the plaintiff in asserting her rights was guilty of unreasonable delay that prejudiced the defendants." *Stone v. Williams*, 873 F.2d 620, 623 (2d Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362, *vacated on other grounds*, 891 F.2d 401 (2d Cir.1989); *see also Rapf v. Suffolk County of New York*, 755 F.2d 282, 292 (2d Cir.1985). A court's application of laches may be "overturned only when it is said to constitute an abuse of discretion." *Stone v. Williams*, 873 F.2d at 624; *see also DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 15 (2d Cir. 1983).

 As a preliminary matter, one would have to assume that IMA had the status at the time of the bar date of a known creditor still entitled to notice in order to consider whether its present application was precluded by the equitable laches doctrine. IMA contends that as a matter of law if it was a known creditor to whom no notice was sent of the bar date it had the absolute right to file its late claim. However, this contention fails to distinguish between the equitable objectives of the laches doctrine and the general notice requirements of bankruptcy law. This distinction was made perfectly clear in a recent chapter 11 case administered in the Fifth Circuit, *In re Hunt*, 146 B.R. 178 (Bankr.N.D.Tex.1992). In *Hunt*, the bankruptcy court determined that failure of a debtor to provide notice does not preclude a laches defense to the claims. The court in *Hunt* stated:

A creditor's claim can be barred for failure to file a proof of claim prior to the bar date only if the creditor received reasonable notice of the bar date. It is undisputed that Plaintiffs did not receive notice of the bar date.... However, that does not end the Court's inquiry, for a creditor can not wait indefinitely to file a claim. This court may apply the equitable doctrine of laches to prevent the late filing of a proof of claim if Plaintiff's delay was unreasonable ... (citations omitted) *Id.* at 184; *see also In re Barsky*, 85 B.R. 550, 554 (C.D.Cal.1988), *aff'd*, 933 F.2d 1013 (9th Cir.1991) (in chapter 11 case, failure to provide notice "does not preclude a court from limiting the creditor's right to file a claim pursuant to the independent doctrine of laches."). These cases clearly illustrate the distinction between a creditor's rights to notice under the bankruptcy law and debtor's right to resist dilatory claims under the equitable doctrine of laches. In accordance with these precedents, we find nothing in the bankruptcy code or elsewhere which as a matter of law would proscribe application of the laches doctrine in this case.[4]

---

3. Alternatively, IMA contends that the Agreement contemplated the Amendment, and thereby extinguished Drexel's right to consent. However, the amendment provisions of the Guaranty and the Agreement are expressly to the contrary of any such contemplation, and we find no other evidence in the record to support this contention.

4. Of course, this holding in no way suggests that a court should not consider failure to provide notice as a factor in its laches analysis. *See In*

Having determined that, as a matter of law, laches may bar IMA's claim, and disregarding whether IMA was any longer a "creditor" at the time of the order directing notice and setting a bar date, we now consider whether the Bankruptcy Court abused its discretion in making a determination of laches in this case. In reviewing the application of the laches doctrine, "[w]e must analyze the reasonableness of delay and the resulting prejudice ..." *Stone v. Williams*, 873 F.2d at 624. IMA had allowed a material modification to the underlying Agreement in May, 1990, and then allowed one-and-a-half years to elapse between Rehab's initial act of default on October 23, 1990 and IMA's first demand for payment from Drexel on April 7, 1992 pursuant to the modified Agreement. IMA waited a further period of six months after the well-publicized notice of the completion and consummation of the bankruptcy reorganization plan before moving to present a late proof of claim. IMA failed to take any action in the interim to preserve or protect its alleged rights under the guaranty, not even by filing a protective claim. IMA has failed to proffer any reasonable excuse for its lackadaisical behavior, stating only that it spent seven months unsuccessfully offering its case to one law firm after another following repeated refusals to take its case, and involving itself in other corporate affairs.

With respect to prejudice, IMA's claim would consume a significant portion of the remaining reserves created in consummating the Drexel reorganization. To allow such a late claim would by a substantial factor materially dilute other disputed claims which had been properly asserted and were awaiting liquidation out of the remaining undistributed assets. With consummation of its confirmation plan on April 30, 1992 and distribution of its assets, Drexel effectively had closed its doors and went out of existence. In light of IMA's dilatory conduct and the prejudice resulting from these delays, we find that the Bankruptcy Court was well within its discretion

in making a ruling that IMA's claim was also barred for laches.

AFFIRMED.

*re Concord Coal Corp.*, 81 B.R. 863, 868 (S.D.W.Va.1988) (court denies chapter 11 debtor's laches defense, finding that debtor possessed "unclean hands" for failure to provide notice to known creditor).