**In re C. H. STUART, INC. and Liege, Inc., Debtors.**

**RSJ CONSTRUCTION CORPORATION, A New York Corporation as the Sole Beneficiary of a Trust Fund Arising Under Article 3–A of the New York Lien Law, Plaintiff,**

v.

**C. H. STUART, INC., as Trustee and Debtor-in-Possession of Legal Title Only in a Trust Fund Arising Under Article 3–A of the New York Lien Law, Defendant.**

**Bankruptcy Nos. 81–20331, 81–20332 and 81–2226A.**

United States Bankruptcy Court, W. D. New York.

Feb. 11, 1982.

Couch, Coulter & Howard, P. C., Joel M. Howard, III, Albany, N. Y., for plaintiff.

Shea & Gould, Philip R. Mann, New York City, for defendant.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

On March 28, 1978, RSJ Construction Corporation (RSJ) entered into a contract with C. H. Stuart, Inc. (Stuart) for the construction of office, warehouse and manufacturing facilities on real property owned by Stuart and located in Saratoga County, New York. The new facility became the home for the Artcraft Concepts division of C. H. Stuart.

Stuart's board of directors authorized capital expenditures of $5,450,000 for the building and furnishing of the new Artcraft complex. The construction budget for the RSJ contract was set at $3,600,000. The contract provided for payment to RSJ of costs incurred in pursuance of the contract plus a fee of $84,160.

On August 29, 1979, after construction was commenced and before it was completed, Stuart mortgaged the Saratoga Springs property to Lincoln First Bank. This mortgage secured antecedent indebtedness owed by Stuart to Lincoln. The bank advanced no new money to Stuart in consideration of the mortgage either at the time the mortgage was executed or thereafter. The mortgage did contain an Article 3–A trust fund clause as required by § 13 of the New York Lien Law.

On November 30, 1979, the architect issued his certificate of substantial completion of the project and a permanent certificate of occupancy was issued on December

18, 1979. Appended to the architect's certificate of substantial completion was a lengthy checklist of items yet to be completed by RSJ. RSJ continued to perform this work and sometime during the course of performing its contractual duties (the record does not reveal precisely when) did some modification work that was outside the scope of duties required by the contract. The modification work had been requested by Artcraft officials.

According to the terms of the contract, RSJ periodically would forward to the architect a requisition for payment form which included a summary of job costs incurred subsequent to the date of the last requisition and through the date for which payment was requested. The cost of the extra-contractual modification work was included in the contractual payment process and paid for in due course after approval of the work by the architect.

On or about October 1, 1980, RSJ submitted its final requisition for payment in the aggregate amount of $3,634,513.56. Of this amount, $3,588,983.31 had already been paid. The aggregate bill included the modification costs previously billed by and paid to RSJ.

On October 3, 1980, Mr. Stewart, president of RSJ and Messrs. Waldrip and Vanderslice, president and vice-president respectively of Artcraft Concepts, met to discuss the fact that the aggregate requisition for payment exceeded the construction budget by $34,513.56. It was determined that $33,030.50 of the overage, an amount representing the cost of the modification work, should have been billed against a separate capital appropriations budget for furniture and other things and not the RSJ construction budget. The Artcraft people corrected the error by rebilling the modification costs to another account and adjusting downward RSJ's request for payment on the contract to $3,601,483.06.

According to the testimony of Messrs. Stewart and Vanderslice, Mr. Waldrip, at the same meeting, approved and agreed to pay an additional $30,000 to RSJ for work performed on change orders during the course of construction. The contract provides for an adjustment of fees in the event change orders of major substance are approved that materially effect time of completion and any fee adjustment would be determined on the basis of the fee established for the original work. The parties have stipulated that change orders were approved from time to time in connection with the project but with respect to the fee on the change orders, no writing supporting the same exists (other than an unsigned memorandum in Mr. Waldrip's handwriting) and such items were not included in any requisition for payment until included in the final requisition for payment.

At the time of the October 3, 1980 meeting, all work had been completed pursuant to the contract but for some unspecified work requiring 30 hours of labor by an RSJ employee during the week of November 18, 1980, the delivery on February 12, 1981 of some surplus asbestos floor tile and some landscaping that was completed in late April of 1981.

On March 6, 1981, Stuart filed with the Court its petition for relief under Chapter 11 of the Bankruptcy Code. On March 11, 1981, RSJ filed with the County Clerk of Saratoga County a mechanics lien against the Artcraft premises in the amount of $45,531.45. On September 9, 1981, RSJ initiated this adversary proceeding in which it seeks a determination: that it is an Article 3–A trust fund beneficiary and that it has a valid mechanics lien against the Saratoga property. Stuart disputes the amount of the RSJ claim, denies that RSJ is a trust fund beneficiary, disputes the validity of the mechanics lien and counterclaims for damages against RSJ alleging that the amount of the mechanics lien was willfully exaggerated.

■ The first issue to be resolved is the proper amount of the RSJ claim. RSJ filed a claim for $45,530.25, which amount includes the $30,000 fee on change orders allegedly approved by Mr. Waldrip on October 3, 1980. Stuart argues that RSJ's claim for the additional fee is unenforceable since it is predicated on an attempted oral modi-

fication of a written agreement in violation of General Obligation Law § 15–301(1) which provides:

§ 15–301(1) A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

This statute applies to oral executory agreements changing a written contract. The contract was not changed in any way by Mr. Waldrip's oral agreement to pay an additional $30,000 fee on change orders. Article 6 of the contract expressly provides for an adjustment in the contractor's fee for changes in the work that are of major substance and materially affect the time of completion of the contract. Article 15 provides that changes in the work must be authorized by a change order and signed by the owner. The parties have stipulated that such change orders were approved and Stuart has made no attempt to deny that RSJ satisfactorily performed the work.

The contract does not require the parties to agree in writing at the time a change order is issued to the compensation to be paid for said change order. Perhaps this is because at the time a change order is issued, the parties do not know what the costs should be. Only at the time the work was nearly complete did the parties know the costs.

At the October 3, 1980 meeting, it had already been known to the parties for some time that changes in the work had been approved, that the work had been done and that an additional fee would be required— all that was left was to negotiate the amount of the fee adjustment. The contract itself provided a formula for determining the additional fee: "Contractor's fee for any such changes in the work shall be determined on the basis of the fee established for the original work."

By resolving the amount of the fee adjustment, the parties did not change the contract; to the contrary, they acted in pursuance of the express terms of their original agreement. The testimony of Mr. Stewart and especially that of Mr. Vanderslice, vice-president of Artcraft, together with the written memorandum, unsigned but in Mr. Waldrip's handwriting, are convincing evidence that the fee was negotiated and the amount resolved in the amount of $30,000 on October 3, 1980.

■ Stuart next argued that Waldrip had no authority to approve the $30,000 fee adjustment since in doing so the project was put over budget by $34,513.56. It is clear that Waldrip did have authority to negotiate the fee adjustment, but both he and RSJ knew he had no authority to exceed the construction budget of $3,600,000 authorized by the Stuart board of directors. However, as shown above, once the $33,030.57 of costs which should not have been included in the construction budget were rebilled to the proper capital appropriations budget, the amount by which the RSJ final bill exceeds the budget is only $1,482.99. Although Stuart argues that the rebilling was merely a scheme to defraud Stuart, its vice-president's, Mr. Vanderslice, testimony is that the rebilling was proper. Therefore, RSJ's claim should be reduced by the amount it would cause total construction costs to exceed the $3,600,000 budget and the proper amount of RSJ's claim should be $44,047.46.

■ The next issue is whether RSJ is a trust fund beneficiary under Article 3–A of the New York Lien Law, § 70 et seq. Section 70 is entitled "Definition of Trust" and provides in pertinent part:

§ 70(1) The funds described in this section received by an owner for or in connection with an improvement of real property in this section . . . shall constitute assets of a trust for the purposes provided in section 71 of this chapter.

Subdivision 5 of § 70 amplifies the meaning of "the funds described in this section". It says in pertinent part:

§ 70(5) The assets of the trust of which the owner is trustee are the funds received by him . . . (c) under a mortgage

404

recorded subsequent to the commencement of the improvement and before the expiration of four months after completion of the improvement.

RSJ argues that an Article 3–A trust arises whenever a mortgage is given within the statutory period without regard to when the loan for which the mortgage was given was received by the mortgagor. RSJ takes the position that even when the mortgage secures antecedent indebtedness, an Article 3–A trust fund still arises. RSJ claims that if the rule were otherwise the mortgagor and the mortgagee would be able to improve their positions at the expense of an unpaid contractor. RSJ is wrong on both counts. *Monroe Savings Bank v. First National Bank of Waterloo*, 50 A.D.2d 314, 377 N.Y.S.2d 827 (4th Dept 1976).

*Monroe Savings* was a case in which a mortgage was recorded within the statutory period, contained the trust fund covenant required by § 13(3) of the Lien Law, but was given to secure antecedent indebtedness. Justice Cardamore said:

"The legislature contemplated the creation of a trust fund by a contemporaneous exchange of consideration or a series of subsequent advances, not simply a verbal recital of the creation of such fund in a mortgage securing a pre-existing debt. Such a reading of the legislative intent is apparent from the language in subdivision 3 of § 13 of the Lien Law which provides that the mortgagor "will receive the advances secured thereby and will hold the right to receive such advances..."

*Id.* at 318, 377 N.Y.S.2d 827.

Therefore, the Court held that:

"[T]he subdivision (3) trust covenant is without effect in this case since the [mortgagor] could not agree to receive as a trust fund money that was previously advanced to it and which was spent long before the execution of the mortgage which included the trust fund covenant."

*Id.* at 317, 377 N.Y.S.2d 827:

■ The same reasoning must apply in the case at bar: where there is no trust res,

there is no trust. However, this does not mean that a contractor is left defenseless in such a situation. Unless a mortgagee advances new money in consideration for the mortgage, the trust fund covenant is of no effect and the mortgage cannot gain priority over subsequently filed mechanics liens.

The primary issue in *Monroe Savings* was whether a mortgagee, even though in technical compliance with § 13(2) of the Lien Law, should gain priority over subsequently filed mechanics liens when the mortgage secured only antecedent indebtedness. The Court held:

"The mere fact that the mortgage contains the required trust fund covenant should not afford the bank a priority over subsequently filed mechanics liens when in fact no trust fund was created."

*Id.* at 317, 318, 377 N.Y.S.2d 827.

The final issue presented in this case is whether the mechanics lien filed by RSJ on March 1, 1981 is valid and effective.

Stuart challenges the validity of RSJ's mechanics lien on two counts. First, that it was not timely filed and second, that it is a statutory lien voidable pursuant to § 545 of the Bankruptcy Code.

■ Section 10 of the Lien Law establishes the time for filing a notice of lien and provides in pertinent part:

§ 10 Notice of lien may be filed at any time during the progress of the work and the furnishing of materials, or, within four months after the completion of the contract, or the final performance of the work, or the final furnishing of the materials, dating from the last item of work performed or materials furnished.

Stuart argues that the operative date for determining timeliness of the filing of the notice of lien is the date the architect issued his certificate of substantial completion. But this cannot be, since the certificate itself had appended to it several pages of items yet to be completed by RSJ. The date of substantial completion was simply the time at which work was sufficiently progressed so that Artcraft could move into

the building and that certain responsibilities would shift from the contractor to the owner. Furthermore, the contract itself distinguished between substantial completion and final completion of the project. The architect was to issue a certificate of final completion of the project upon several conditions, the operative condition here being the full performance of the work by RSJ.

That RSJ did not submit its final requisition for payment until October 1, 1980 is compelling evidence that work on the project continued at least through the period for which payment was requested: i.e. through September 30, 1980 and the fact that RSJ submitted its final bill on October 1st does not necessarily mean that it had completed its duties since the final bill is not payable until the work is reviewed and certified as complete by the architect. The record does not reveal when or if the architect issued a certificate of final completion.

The record does show, however, that 30 hours of work was done by an RSJ employee during the week of November 18, 1980, some floor tile was delivered on February 12, 1981 and landscaping was completed in late April of 1981. In the absence of evidence to the contrary, it must be assumed that this work was done in furtherance of the contract. Therefore, since the contract had not been completed within four months before RSJ filed its notice of lien, the mechanics lien was timely filed.

■ Finally, Stuart argues that even if the mechanics lien was timely filed, it is avoidable under § 545(2) of the Bankruptcy Code which provides:

§ 545 The trustee may avoid the fixing of a statutory lien on property of the debtor to the. extent that such lien—

(2) is not perfected or enforceable on the date of the filing of the petition against a bona fide purchaser that purchases such property on the date of the petition, whether or not such a purchaser exists.

However, the powers of a debtor-in-possession under § 545 are limited by § 546(b) which provides in pertinent part:

§ 546(b) The rights and powers of the trustee under section 544, 545 or 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection.

Section 13(5) of the Lien Law is such a generally applicable law:

§ 13(5) No instrument of conveyance recorded subsequent to the commencement of the improvement, and before the expiration of four months after the completion thereof, shall be valid as against liens filed within four months from the recording of such conveyance . . .

The date of "conveyance" to the hypothetical BFP was March 6, 1981 which was before the expiration of four months after the completion of the project. RSJ filed its lien on March 11, 1981 which was within four months of the "conveyance". Therefore, the debtor-in-possession cannot avoid the lien under § 545.

RSJ is not an Article 3–A trust beneficiary but does have a valid, first priority lien against the Saratoga Springs property which secures an allowable claim for $44,-847.46 and it is so ordered.