In re JAMES A. PHILLIPS,
INC., Debtor.

ARMSTRONG WORLD INDUSTRIES,
INC., Appellant,

v.

JAMES A. PHILLIPS, INC., Appellee.

Nos. 82 Civ. 5264(ADS), 82
Civ. 5265(ADS).

United States District Court,
S.D. New York.

March 28, 1983.

Finkel, Goldstein & Berzow, New York City, for appellee; Harold S. Berzow, Neal M. Rosenbloom, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Armstrong World Industries, Inc. ("Armstrong") appeals from orders entered by former Bankruptcy Judge Roy Babitt authorizing certain payments by the debtor in possession James A. Phillips, Inc. ("Phillips"). For the reasons that follow, Armstrong's appeal is denied and the Bankruptcy Judge's orders are affirmed.

Phillips is an accoustical ceilings and walls contractor, and Armstrong is a supplier of construction materials. On December 14, 1981 Armstrong obtained a $74,101.91 judgment against Phillips for goods sold and delivered. On June 11, 1982, having suffered major losses on a large construction project and in anticipation of an execution to satisfy Armstrong's judgment, Phillips filed a petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq. Armstrong has not moved for conversion or dismissal of that filing, see 11 U.S.C. § 1112(b), or for relief from the stay of execution of its judgment, see 11 U.S.C. § 362(d)(1). On June 16, 1982 Phillips applied to the Bankruptcy Court for authority to pay a number of construction suppliers other than Armstrong. That same day Judge Babitt signed orders authorizing the payments without a hearing and without notice to Armstrong or to any of Phillips' other creditors. Armstrong's counsel learned of these orders a few days after June 16, during a check of Phillips' file in the Bankruptcy Court. On June 25, 1982 Judge Babitt heard argument on and denied Armstrong's application to vacate his orders.

Phillips maintains that the payments authorized by the Bankruptcy Court were essential to its hopes for survival. The suppliers to whom the payments were authorized had provided materials to Phillips at three construction sites. Phillips had substantially completed its work at two of those sites, but in response to one supplier's threat to file a mechanics' lien on the buildings involved, the contractors at the sites, Regal Construction Corp. and O & Y Construction Corp., stopped payment on checks delivered to Phillips and indicated that further payments due Phillips would not be forthcoming until all suppliers with potential liens were paid. The amounts due Phillips from Regal and O & Y (respectively $27,279 and $104,206) were substantially greater than the amounts authorized by the Bankruptcy Court to be paid the suppliers on each site ($10,065 and $36,665). At the third site Phillips had not substantially completed its work, and had not been contacted by the contractor, George A. Fuller Co., or by any of the suppliers who had the right to file liens on the real property involved. Moreover, the amount then due Phillips from Fuller ($42,261) was substantially less than the amount authorized to be

paid the suppliers on the site ($69,421). Phillips maintains, however, that the potential liens of the unpaid suppliers posed a real threat to its eventual realization of a substantial profit on its contract with Fuller.

Armstrong objects to the payment of over $117,000 to other suppliers of Phillips, while Armstrong's judgment against Phillips for over $74,000 remains unsatisfied, with execution frozen by Phillips' chapter 11 petition. As a result of the payments authorized by Judge Babitt, Armstrong's share of the monies owed Phillips' top fourteen creditors jumped from 35% to 61%. Relying upon various provisions of the Bankruptcy Code as well as the decisions in *In re Texlon Corp.*, 596 F.2d 1092 (2d Cir. 1979), and *In re Sullivan Ford Sales*, 2 B.R. 350 (Bkrtcy.D.Me.1980), Armstrong challenges the Bankruptcy Court's orders as improper, ex parte authorizations of preferential payments.

At the root of the many difficulties posed by this appeal is the nature of the potential liens available to the "preferred" supplier-creditors. The suppliers' right to assert liens under state law is not stayed by the debtor's chapter 11 petition. Rather, § 362(b)(3) and § 546(b) of the Bankruptcy Code, 11 U.S.C. § 362(b)(3), § 546(b), permit such liens to "relate back" to the time of the underlying debt's creation as provided by New York Lien Law § 13(5) (McKinney's 1982). *See In re C.H. Stuart, Inc.*, 17 B.R. 400 (Bkrtcy.W.D.N.Y.1982); *In re Fiorillo & Co.*, 19 B.R. 21, 8 B.C.D. (CRR) 1169 (Bkrtcy.S.D.N.Y.1982); King, et al., 4 *Collier On Bankruptcy* ¶ 546.03 (1979). Armstrong's lien rights apparently were never exercised within the 120 days after furnishing materials allowed by New York Lien Law § 10 (McKinney's 1982), and, in any event, in June 1982 the construction projects to which Armstrong had delivered supplies for Phillips no longer figured in Phillips' business operations. Thus, despite its judgment against Phillips, Armstrong was in a substantially inferior position to that of the suppliers with potential lien rights involving projects where Phillips ei-

ther was owed money or had ongoing contractual obligations. The only remedy available to Armstrong, execution on its state-court judgment, was stayed; the remedy available to the other suppliers, placing liens on the construction sites to which they had delivered materials for Phillips, was not stayed. Due to the interaction of state and federal law which gives such suppliers potential remedies unaffected by § 362's automatic stay, the suppliers were effectively in a separate class from Phillips' other unsecured creditors.

The Code provides no clear answer to the question whether Armstrong was entitled to notice of the applications to pay the suppliers. Indeed, one cannot fault the Bankruptcy Court's equivocal conclusion at the June 25, 1982 hearing that "maybe it [the application for payments] should have been on notice and hearing because it's out of the ordinary, although I am not even sure it's so." Transcript of 'June 25, 1982, Bankruptcy Court Hearing (hereinafter "Transcript") at 12. On this appeal Armstrong initially relied on § 1109(b) of the Code, 11 U.S.C. § 1109(b), which provides that a party in interest "may raise and appear and be heard on any issue in a case under [chapter 11]." The notice requirement in this section is implicit at best. As the leading treatise has observed, the question of notice under § 1109(b) "undoubtedly will be a source of litigation," but any rule requiring "a right to notice of all steps taken in the reorganization ... would result in much unwarranted difficulty and expense." King, et al., 5 *Collier On Bankruptcy* ¶ 1109.02[3] (1979).

Unlike the implicit notice requirement of § 1109(b), provisions elsewhere in the Code explicitly deal with the issue of notice. Section 363(b) and § 363(c)(1), 11 U.S.C. § 363, provide that a trustee may use, sell or lease the bankrupt's property without notice and a hearing only so long as the transactions are conducted "in the ordinary course of business." These provisions apply to a debtor in possession under 11 U.S.C. § 1107(a). Thus, if the payments in this case were transactions "in the ordinary

course of business," there was no need for notice or hearing under the Bankruptcy Code; indeed, payments in the ordinary course need not be authorized by a Bankruptcy Court at all, since § 1107(a) and § 1108, 11 U.S.C. § 1107(a) & § 1108, automatically permit the debtor in possession to operate its business. *See In re Hanline,* 8 B.R. 449 (Bkrtcy.N.D.Ohio 1981) (transaction outside ordinary course does not require court authorization where no creditor objects following proper notice). In its reply papers, Armstrong shifted the focus of its arguments to § 363, implicitly assuming that the payments authorized by the Bankruptcy Court were not in the ordinary course of business.[1] At oral argument and in correspondence to the Court, Phillips has challenged this assumption by pointing out that an accoustical subcontractor would, in the ordinary course of its business, generally pay creditors with potential mechanics' lien law rights before creditors without such rights.

▆▆▆ The legislative history of § 363 provides no test or guideline concerning the scope of the "ordinary course of business" standard. Hughes, *"Wavering Between the Profit and the Loss": Operating a Business During Reorganization Under Chapter 11 of the New Bankruptcy Code,* 54 Am.Bankr. L.J. 45, 74 n. 207 (1980); *see* H.R.Rep. No. 595, 95th Cong., 1st Sess. 182, 345 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, *reprinted in,* King, et al., 2 App. *Collier On Bankruptcy* (1979). Nonetheless, the apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) & § 1108. The touchstone of "ordinariness" is thus the interested parties' reasonable expectations of what transac-

tions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections to such transactions are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves. Where the debtor in possession is merely exercising the privileges of its chapter 11 status, which include the right to operate the bankrupt business, there is no general right to notice and hearing concerning particular transactions. To preclude such transactions, interested parties must apply to the Bankruptcy Court for relief from the stay, 11 U.S.C. § 362(d)(1), or for conversion or dismissal of the chapter 11 petition, 11 U.S.C. § 1112(b).

Under this analysis, payments of the sort involved here might well have been "in the ordinary course of business." Given the special status of suppliers whose unstayed lien rights have not expired under state law, payment to such suppliers following a contractor's chapter 11 filing would appear a reasonable response to business exigencies. But for the accelerated nature of the payments precipitated by Phillips' chapter 11 filing, the payment of suppliers with potential lien rights seems within the ordinary course of Phillips' business activities. *Cf. In re Listle/Shreeves Corp.,* 20 B.R. 421, 423 (Bkrtcy.M.D.Fla.1982) ("It is an accepted practice of the construction industry to pay subcontractors and to bond off mechanics' liens against real property . . . by posting either a bond or placing funds in the registry of the court."). This appears to be what Judge Babbitt meant when he stated at the July 25 hearing, "I don't think [the payments] are out of the ordinary if you weren't in Chapter 11." Transcript at 14.

▆▆▆ In its post-argument brief, however, Phillips acknowledges that the payments in this case were made under exigent circum-

---

1. In a post-argument brief, Armstrong also makes reference to the notice requirements of § 362(c)(2). This provision is inapposite. It deals with transactions involving cash collateral, not cash. *See* King, et al., 2 *Collier On*

*Bankruptcy* ¶ 363.04 (1979). Notwithstanding its judgment against Phillips, Armstrong had no property interest in any of Phillips' cash that would entitle Armstrong to notice under § 362(c)(2).

stances and at an accelerated rate. Appellee's Post Argument Brief 3. Although payment of suppliers with potential lien rights may be ordinary, Phillips implicitly recognizes that payment of such suppliers in advance of payment from the main contractor is extraordinary. Indeed, Phillips' counsel admitted at the June 25, 1982 hearing that the payments "were out of the ordinary." Transcript at 13. One might argue that the filing of a chapter 11 petition can reasonably be expected to require accelerated payments of creditors with potential lien rights. But this is a factual matter, turning on the particular circumstances presented, including whether the creditor involved had filed or had threatened to file a lien, and whether payment delayed until the general contractor had paid the debtor would jeopardize the relationship between the contractor and debtor. These are the sorts of issues on which creditors in the chapter 11 proceeding should have an opportunity to be heard, however summarily, before the accelerated payments are formally authorized by a Bankruptcy Court. Such an opportunity would ensure that the facts alleged by the debtor in possession are at least colorably supported, and would avoid preferential payments that may be commercially unsupportable or downright fraudulent. The safe course under the statute therefore appears to be, as Judge Babitt ultimately concluded, to require that notice of some sort be given to creditors of the estate before accelerated payments to potential lienors are authorized.[2]

The notice required, however, should not be permitted to undermine the capacity of the debtor in possession to accomplish the legitimate ends sought by the transactions at issue. In this case, the only notice required was a telephone call informing Armstrong that Phillips intended to seek the relief involved, and a brief opportunity (measured in hours rather than days) to examine and verify the fundamental facts alleged. The form and extent of notice required under the Code depends on the particular situation before the Bankruptcy Court, and the action proposed by Phillips required only a brief opportunity to confirm the underlying facts and to argue its propriety. See 11 U.S.C. § 102; King, et al., 2 Collier On Bankruptcy ¶ 102.02 (1979).

Lack of proper notice under the Bankruptcy Code ordinarily is a serious deficiency, usually requiring some form of corrective action on appeal. Several considerations make reversal an inappropriate response in this case, however. The circumstance that made the payments in this case extraordinary was their timing, not their nature. Short of objecting to the overall legitimacy of Phillips' chapter 11 status, Armstrong could not have objected in principle to the prior payment of suppliers with potential lien rights; the interplay of state and federal law is such that the suppliers were a special class of creditors whose bills could reasonably be paid ahead of Armstrong to prevent Phillips' operations from coming to a standstill because of mechanics' liens on its construction sites. As Judge Babitt put it at the June 25 hearing, "the fact that these people have been 'preferred' is unfortunately a fact of life. . . . These people [the suppliers] stand in a unique position—they can be pulled off the job, put liens on the property and, therefore, nobody gets anything." Transcript at 13. Armstrong has suggested no way, moreover, in which the accelerated nature of the payments prejudiced its interests, except to the extent that nonpayment might have driven

---

**2.** Perhaps a Bankruptcy Court should never authorize payments without notice and hearing under § 363. Insofar as transactions are actually in the ordinary course, they are authorized automatically by § 363(c)(1) and § 1107(a), and do not require Bankruptcy Court approval. See supra at 393–94. Since the only occasions definitely requiring Bankruptcy Court authorization involve nonordinary transactions to which interested persons object following notice, Bankruptcy Courts should routinely require notice and hearing whenever a debtor or trustee requests authorization for any transaction, if the Court decides to give its sanction to the transactions involved. See In re Hanline, 8 B.R. 449 (Bkrtcy.N.D.Ohio 1981) (discussing legislative history of Code in refusing authorization of nonordinary transaction as unnecessary where no creditor objected following proper notice).

Phillips into immediate liquidation and perhaps resulted in satisfaction of a greater percentage of Armstrong's judgment against Phillips than may occur if Phillips' reorganization effort hereafter fails. Prejudice from Phillips' ongoing reorganization must, however, be raised by a § 362(d)(1) motion for relief from the stay, or by a § 1112(b) motion to dismiss or convert Phillips' chapter 11 petition.

A second consideration favoring affirmance of the Bankruptcy Court orders, despite the lack of notice, is that a hearing was in fact held on June 25, at which Armstrong failed to challenge the critical facts alleged in Phillips' June 19 applications for accelerated payments. Armstrong on this appeal characterizes the facts alleged by Phillips as mere "self-serving representations." Appellant's Brief 17. But the June 25 transcript demonstrates that Armstrong did not question the critical facts—such as amounts owed and amounts owing—that supported Phillips' June 19 applications. Armstrong's counsel focused at the hearing on lack of notice, and on the uncertainty involved in the payments made to suppliers at the site where Phillips had not substantially completed its work for the George A. Fuller Co. Transcript at 8–14. Armstrong's present objections to the Bankruptcy Court's reliance on the allegations in Phillips' applications are now too late, and are in any event unsubstantiated by allegations that would place in doubt any of Phillips' factual claims not challenged at the hearing. Furthermore, insofar as Armstrong did challenge the facts, or rather predictions of successful performance, underlying the application to pay suppliers at

the Fuller site, Armstrong failed to demand a full hearing, or to offer evidence that controverted Phillips' allegations. Moreover, as Judge Babitt suggested by pointing out that Phillips' reorganization plan was unlikely to proceed without Armstrong's cooperation, Transcript at 15–16, the underlying objection to payments to the Fuller suppliers was not their "preferential" nature, but rather the uncertainties involved in *any* effort at reorganizing Phillips and bringing it out of bankruptcy. *See* Transcript at 14. This objection belongs in a § 362(d)(1) or § 1112(b) motion, not on an appeal from the authorization of payments made in the context of a presumably valid chapter 11 reorganization effort.

A final consideration weighing against reversal of the Bankruptcy Court's order is § 363(m)'s specific provision that "reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." If this provision were applicable to the Bankruptcy Court orders in this case, then a reversal of those orders would have no practical significance, since the relief Armstrong seeks in this case is reversal of the order permitting the payments. Armstrong argues that § 363(m) is inapplicable because payments to suppliers are not sales or leases of property. The definition sections of the Code do not define "sale" or "lease", and an analysis of § 363's use of the terms provides no clear answer to their scope in § 363(m).[3] A reasonable argument

---

3. Section 363(c)(1) provides that "the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice of a hearing." Inasmuch as this subsection specifies sales or leases as a particular category of "transactions", the later reference in § 363(m) to "a sale or lease of property" should perhaps be narrowly construed to exclude transactions, such as payments for supplies, that do not readily fit everyday definitions of "a sale or lease of property."

On the other hand, § 363(b) simply states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Here, despite the absence of any reference to "transactions", the words "use, sell, or lease" seem intended to include the entire range of transactions the trustee or debtor might enter; were it otherwise, the statute would not authorize transactions, other than "use", "sale", or "lease", which were not in the ordinary course despite the fact that notice was given. Similarly, § 363(c)(2) provides that the "trustee may not use, sell or lease cash collat-

could be made, however, that § 363(m)'s failure to mention the term "use" should be considered significant, and that by implication the reference in § 363(m) to "sale or lease" should be construed to exclude a purchase of supplies with cash.[4] Regardless of whether § 363(m) should be deemed to apply here, however, the policy behind § 363(m) is evidently to protect third parties that rely on Bankruptcy Court authorizations in their dealings with the trustee or debtor. That policy is particularly implicated in this case. The suppliers paid under the Bankruptcy Court's June 16 orders had potential mechanics' liens which, under state law, have now expired. Regardless of whether those suppliers would have filed liens in the absence of the Bankruptcy Court order, they likely would have done so if Phillips had failed to pay them even after being paid by its contractors. If the payments to them are invalidated now, however, the suppliers will be left without payment from Phillips and without the state-law lien rights that were previously available to secure payment for the goods and services they provided at the construction sites. Such a result would unfairly prejudice the suppliers who relied upon the Bankruptcy Court's authorization of payments by not filing liens once payments were received from Phillips.

Appellant's reliance on *In re Texlon Corp.,* 596 F.2d 1092 (2d Cir.1979), is misplaced. That case was decided under the old Bankruptcy Act and involved the ex parte authorization of a financing scheme whereby one creditor obtained security for pre-petition unsecured debt in exchange for advancing secured credit to the bankrupt. The Second Circuit affirmed a reversal of the Bankruptcy Court's authorization, because the financing scheme was too preferential to have been approved solely on representations of the debtor in possession as to the unavailability of other sources of credit. 596 F.2d at 1098. The preferential nature of the payments authorized in this case, however, is not nearly as pronounced. Whereas the "preferred" creditor in *Texlon* received a security interest on pre-petition debt in exchange for extending additional secured debt, the suppliers in this case received accelerated payment on pre-petition debt that could effectively have been secured by potential lien rights not stayed by Phillips' chapter 11 petition. These rights are in themselves exceptions to the accepted bankruptcy principle of equal distribution among creditors, *see* King, et al., 4 *Collier On Bankruptcy* ¶ 546.03 (1979), and as such they cannot be ignored in evaluating the propriety of the orders in this case.

Indeed, *Texlon* distinguished an earlier case, *In re Applied Logic Corp.,* 576 F.2d 952, 959–60 (2d Cir.1978), on the ground that it involved a bank's set-off right "which by its very nature produces inequality." 596 F.2d at 1098. In *Applied Logic* the Circuit Court ruled that a bank's set-off right should not be lost simply because the bank had directly participated in arrangements made with other creditors to attempt to rehabilitate the debtor. The Court reasoned that, unless the scope of the bank's set-off right was thus broadly defined, banks might hesitate ever to participate in efforts to rehabilitate a debtor. Given the existence of an exception to the principle of equality among creditors, the Court concluded, the goal of enabling a bankrupt to recover, not the often conflicting principle

---

4. "eral", unless all parties with an interest in the collateral consent or a court authorizes such use, sale or lease after notice and a hearing. Here, the words "use, sell or lease" were intended to cover a broad range of transactions; otherwise, numerous transactions involving cash collateral, such as purchasing supplies with proceeds in which a secured creditor has an interest, would be exempt from the requirements of § 363(c)(2), when in fact those requirements are plainly designed to protect creditors with security interests in cash.

4. Although "use" appears to be the broadest among the three terms, its inclusion may have been intended to cover events involving the debtor's property, but not involving third parties, such as the operation of machinery in the debtor's business. Thus, the purchase of supplies with cash may be regarded as much a "sale or lease" of property as it is a "use" of property. On the other hand, the use of cash may pose special dangers that warrant exclusion of such transactions from the automatic protection of § 363(m).

of equality, should control in deciding the scope of the exception. The "preferred" creditor in *Texlon* failed to satisfy this rationale because, notwithstanding its claim that the arrangement authorized ex parte by the Bankruptcy Court was essential to the debtor's recovery, the case implicated no exception to the principle of creditor equality that might presumptively have shifted the Court's focus from the equality principle to the goal of debtor recovery. In this case, however, the potential lien rights of the suppliers constitute such an exception to the equality principle, and that consideration justifies the Bankruptcy Court's focus on the goal of debtor recovery and its authorization of the accelerated payments. Notice should have been given; but the circumstances here differ materially from those in *Texlon* in that no cognizable prejudice is evident and none has been alleged.

Appellant's reliance on *In re Sullivan Ford Sales*, 2 B.R. 350 (Bkrtcy.D.Maine 1980), is similarly misplaced. In that case, Bankruptcy Judge Cyr refused to authorize without sufficient notice a financing scheme involving the use of "cash collateral" and the creation of new debt with a special priority over administrative expenses. Under § 364(c)(1) and § 363(c)(2)(B), the special priority and the use of "cash collateral" unquestionably could not have been authorized without appropriate notice. Unlike the payments in this case, those transactions were by their nature out of the ordinary course of the debtor's business and they created potential prejudice to the debtor's creditors wholly unrelated to the prejudice inherent in allowing a debtor to attempt rehabilitation while the claims of its creditors are stayed. Moreover, the Bankruptcy Court in *Sullivan* emphasized the possibility that, given the twelve-day interval between filing of the petition and the request for ex parte relief, the allegedly emergency nature of the debtor's requests may have been intentionally created by the debtor. 2 B.R. at 354. In this case, despite Armstrong's assertions to the contrary, there is nothing to suggest that Phillips waited five days before submitting its applications to the Bankruptcy Court in order to create an emergency situation to induce a Bankruptcy Judge to grant ex parte relief. The threat to Phillips' business was unexpectedly created when one of its creditors threatened to file liens on its jobs, causing two of its contractors to stop or withhold payments due to Phillips for work it had performed.

 In conclusion, despite the improper lack of any notice, the Bankruptcy Court's orders in this case must be affirmed. The error in not affording notice was harmless, and Armstrong has failed to question the essential facts supporting the ex parte orders. Invalidating the payments made would also unfairly prejudice the suppliers who acted in apparent good faith. The orders of the Bankruptcy Court are affirmed.

SO ORDERED.