**In re Jeffrey E. LAVIGNE, d/b/a Laser Medical Associates of NY, Debtor.**

**MEDICAL MALPRACTICE INSURANCE ASSOCIATION, Plaintiff,**

**v.**

**Hal M. HIRSCH, as Trustee of the estate of Dr. Jeffrey E. Lavigne, d/b/a Laser Medical Associates of NY, Defendant.**

**Bankruptcy No. 92 B 45593 (BRL). Adv. No. 94/8905A.**

United States Bankruptcy Court, S.D. New York.

June 14, 1995.

Werner & Kennedy by Richard J. Cairns, New York City, for plaintiff.

Gainsburg & Hirsch by Hal M. Hirsch and David L. Barrack, Purchase, NY, for the Trustee.

### DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT RELATING TO ESTATE ACCESS TO MEDICAL MALPRACTICE INSURANCE COVERAGE

BURTON R. LIFLAND, Chief Judge.

*Introduction*

On cross motions for summary judgment, this court must weigh the competing claims of Medical Malpractice Insurance Association

("MMIA") and Hal M. Hirsch (the "Trustee"), Trustee of the estate of Dr. Jeffrey E. Lavigne ("Lavigne"). MMIA brought this adversary proceeding to prevent the Trustee from obtaining continued medical malpractice insurance coverage for the estate after the debtor-in-possession cancelled an insurance policy and the case was converted from Chapter 11 to Chapter 7. The Trustee, on the other hand, seeks to establish his right to purchase extended insurance coverage under the terms of the insurance policy. Two inquiries are central to this case: (1) whether cancellation of a medical malpractice insurance policy by the Chapter 11 debtor-in-possession was effective; and if not, (2) whether the Trustee retained any rights under the policy once it was deemed rejected.

*Factual Background*

MMIA is a non-profit, unincorporated joint underwriting association established by the New York Legislature in 1975 to provide professional liability insurance to all physicians and surgeons licensed to practice in New York. MMIA, its rates and policy provisions are governed by New York Insurance Law and the regulations promulgated by the Superintendent of Insurance of the State of New York.

Lavigne, also known as Laser Medical Associates of New York, filed for bankruptcy under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on October 8, 1992. No creditors' committee was appointed (section 1102) by the United States Trustee to exercise the powers and duties specified in section 1103.

Lavigne performed laser surgery in medical offices located throughout the New York metropolitan area. He advertised extensively as "MD–TUSH".[1] Lavigne was insured by Medical Liability Malpractice Insurance Company (MLM) until April 1992 when MLM cancelled the insurance. Thereafter, Lavigne obtained insurance from MMIA. MMIA issued Lavigne a one-year claims-made professional liability insurance policy (the "Policy") effective April 1, 1992 (the "Retroactive Date"). The Policy covered liability for injury or damage arising out of the

---

1. A telephone number acronym describing his anatomical area of specialization.

rendering of or failure to render professional services that occurred on or after the Retroactive Date, as long as claims were first made during the policy period or any extended reporting period. Upon filing for Chapter 11 relief, Lavigne continued to do business and to manage his affairs as a debtor-in-possession. In this capacity, Lavigne renewed the Policy for a one-year period commencing April 1, 1993. However, by letter to MMIA dated September 24, 1993 (the "Cancellation Date"), Lavigne inexplicably cancelled the Policy. The record in this now converted Chapter 11 case reveals that, on or around the Cancellation Date, disturbing events were taking place. Lavigne was faced with numerous tort claims at the time he filed for bankruptcy. *See Trustee's Notice of Motion,* Exhibit A—Schedule F at 17–24 (listing 70 unsecured creditors with malpractice claims against Lavigne). Just prior to cancelling the Policy Lavigne decided to close his last remaining medical office in New York. Two days after cancelling the Policy he attempted to commit suicide. Lavigne was hospitalized at St Vincent's Hospital and put on suicide watch. Impaired, he was then transferred to a rehabilitative facility in New Hampshire and remained there through the end of November 1993 at which time he lost his license to practice medicine. During this period of Lavigne's incapacity, his attorney Michael Sucher ("Sucher") single-handedly took over operation and control of Lavigne's business affairs. Without leave of court, Sucher collected accounts receivable and escrowed them in a non-segregated, general account and at his discretion paid certain claims. When these activities came to light the Court directed Sucher to provide an accounting and emphasized that he had crossed several lines of demarcation as to his appropriate role and function. *See Transcript of Hearing Dated December 9, 1993* at 12–33.

In response to Lavigne's cancellation letter, MMIA informed him by letter that the cancellation was effective as of September 28, 1993, and that his contractual option to purchase Tail Coverage[2] would expire sixty days from termination; namely, on November 28, 1993. Lavigne did not purchase Tail Coverage within the prescribed period. The Court notes that Lavigne was incapacitated in the New Hampshire facility on the expiration date of the option.

On January 27, 1994, Lavigne's case was converted to one under Chapter 7 of the Code and Hal M. Hirsch was appointed Trustee of the estate. Because of the peculiar circumstances of the debtor's disability coupled with the unorthodox conduct of the debtor's operations by his attorney, a clear picture of the debtor's affairs was not readily obtainable by the Trustee. Upon being apprised of the facts, the Trustee sought to exercise the option to purchase Tail Coverage. In a letter to MMIA dated May 3, 1994, the Trustee requested MMIA to send all necessary documents to exercise the option. Instead of resolving the option issue, the parties entered into a Standstill and Tolling Agreement concerning the Policy which this court "so Ordered" on May 31, 1994. On September 29, 1994, MMIA terminated the Standstill and Tolling Agreement and advised the Trustee that it could not grant his request to purchase Tail Coverage for the Policy because, in its opinion, the option had already expired or, alternatively, was not available because the Policy had been rejected.

*Summary of Parties' Positions*

MMIA's motion for summary judgment is based on five claims: (1) Lavigne properly cancelled the Policy, effective September 28, 1993; (2) the option to purchase Tail Coverage expired on November 27, 1993, according to the Policy's terms; (3) the time to make valid claims under the Policy, as extended by the Regulatory Tail Period, expired on November 27, 1993; or, in the alternative, (4) the Trustee's option to assume the Policy and purchase Tail Coverage expired on or before March 27, 1994 (the "Deemed Rejection Date"); and (5) the Trustee cannot seek to

---

2. Tail Coverage is insurance coverage which an insured may purchase upon cancellation or termination of a policy. Such coverage applies to claims which arise during the Policy period but which are first asserted after the Policy period. New York Insurance Law requires MMIA to provide this option. MMIA did so in the instant case in section IV of the Policy titled "Optional Extended Reporting Period".

enforce the terms of a policy that was rejected.

The Trustee's cross-motion for summary judgment is based on five claims: (1) given his failure to obtain court approval, Lavigne's cancellation of the Policy is deemed null and void; (2) cancellation of the Policy was use of property of the estate outside the ordinary course of Lavigne's business; (3) Lavigne's cancellation of the Policy was an abandonment of property without court authorization and therefore a nullity; (4) because Lavigne's cancellation was unauthorized, the Policy remained in effect upon conversion of the case; and (5) section 365(g) of the Code has no retroactive effect. The parties generally agree that there are no material issues of fact in dispute.

*Discussion*

Fed.R.Civ.P. 56, applicable to bankruptcy proceedings through Fed.R.Bankr.P. 7056, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

The essential question on a motion for summary judgment is whether there is a genuine dispute about a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246–247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Orderline Wholesale Dist., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F.Supp. 122, 125–26 (S.D.N.Y. 1987). The moving party bears the burden of demonstrating that no genuine issue of material fact exists, while the nonmoving party is entitled to have all ambiguities resolved, and all factual inferences drawn, in his favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); *In re Wingspread*

*Corp.*, 178 B.R. 938, 941 (Bankr.S.D.N.Y. 1995). In the instant case, the parties agree that this court must resolve one legal issue, namely whether and to what extent medical malpractice insurance coverage extends to the Chapter 7 estate of Lavigne.

As an initial matter the Court must determine whether Lavigne's cancellation of the Policy was effective. Section 1107 of the Code provides a Chapter 11 debtor-in-possession, subject to limitations applicable to a trustee, all the rights, powers, and duties of such trustee, with few exceptions. Lavigne was a debtor-in-possession from the time he filed for bankruptcy on October 8, 1992, until conversion of the case on January 27, 1994. In that capacity, Lavigne was free to conduct his business, subject to, *inter alia*, limitations such as those imposed on debtors-in-possession by sections 363 and 365 of the Code.

*Section 363 of the Bankruptcy Code—Ordinary Course of Business*

 The Trustee asserts that Lavigne's cancellation of the policy was null and void because, *inter alia*, it was use of estate property outside the ordinary course of business for which notice, a hearing and court authorization was required pursuant to section 363 of the Code.[3] Although section 363 is meant to facilitate a debtor's reorganization by allowing it to make decisions in the ordinary course of business, an extraordinary transaction undertaken by the debtor or trustee without notice and a hearing is unenforceable. *In re The Leslie Fay Companies, Inc.*, 168 B.R. 294 (Bankr.S.D.N.Y.1994). In *Leslie Fay* the court stated that:

(t)he Code is not meant to straitjacket the debtor and prevent it from responding quickly to normal business demands; neither, however, is the Code meant to allow the debtor the same freedom it had when it got into financial trouble in the first place. For with bankruptcy come certain obligations to creditors, including affording creditors the right to be heard when the

---

3. Lavigne's cancellation of the insurance policy was use of estate property. *See e.g., In re Johns–Manville Corp.*, 26 B.R. 420 (Bankr.S.D.N.Y. 1983) *aff'd* 40 B.R. 219 (S.D.N.Y.1984), *aff'd sub nom., MacArthur Co. v. Johns–Manville*, 837 F.2d 89 (2d Cir.1988) (Insurance policies are property

of the estate); *In re James A. Phillips, Inc.*, 29 B.R. 391, 396, n. 3 (S.D.N.Y.1983) ("[T]he words 'use, sale or lease' seem intended to include the entire range of transactions the trustee or debtor might enter....").

debtor proposes to do something beyond the ordinary. *Id.* at 304; *see also In re Phillips*, 29 B.R. 391, 394 (S.D.N.Y.1983) (notice and a hearing are required "to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place. . . .")

The legislative history of section 363 does not provide guidance as to the scope of the "ordinary course of business" standard, however, courts have adopted a "vertical" and "horizontal" analysis in determining whether a debtor's activity is within the ordinary course of business. *See In re Drexel Burnham Lambert*, 157 B.R. 532 (S.D.N.Y.1993); *In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986).

■■■ The vertical analysis is a creditor's expectation test which gauges the debtor's actions against the usual, internal modus operandi of the debtor's business and the interests of a hypothetical creditor. *In re Phillips*, 29 B.R. at 394. This analysis requires the court to "examine the debtor's transaction from the vantage point of a hypothetical creditor and inquire whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *In re Johns–Manville*, 60 B.R. at 616. In fact, "the touchstone of ordinariness is the interested party's reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business". *Id.* at 616, (quoting *In re Phillips*, 29 B.R. at 394). This analysis focuses on the debtor's pre and postpetition activities in an effort to discern any significant alterations in its activity.

■■■ The horizontal analysis considers the actions of the debtor in light of industry standards, comparing the debtor's business to other similar businesses to decide whether a type of transaction is in the course of that debtor's business or in the course of some other business. *See, e.g., In re Waterfront Companies, Inc.*, 56 B.R. 31, 35 (Bankr. D.Minn.1985).

MMIA argues that the above analyses are "fact-sensitive" and that because the Trustee failed to submit supporting evidence MMIA's summary judgment motion is not defeated. MMIA also asserts, without foundation, that it is usual and ordinary for a doctor who is discontinuing practice to cancel a claims-made policy and that, in the instant case, it was ordinary and customary for Lavigne to cancel because he did not need to cover any subsequent surgical occurrences. *See Plaintiff's Reply Memo of Law in Further Support* at 19–20.

The Court disagrees. Lavigne's cancellation was an extraordinary transaction which required court authorization. As set forth previously, immediately following Lavigne's decision to cancel the Policy he closed his last office and attempted to commit suicide. Cancellation appeared to be part of an illogical and desperate course of action. The court finds that all of the circumstances extant at the time of Lavigne's cancellation make such act an extraordinary one.

Even if such action were not so obviously out of the ordinary course of business, the court finds it to be such under the vertical and horizontal analyses. Under the vertical analysis, a hypothetical malpractice claimant of Lavigne would not reasonably expect him to cancel his malpractice insurance in light of the bankruptcy proceeding, the cessation of his medical practice and the outstanding claims against him. Malpractice claimants and trade creditors would be looking to the proceeds of his practice for repayment and would expect him to retain coverage. The Policy provided the only form of protection for creditors' interests. A single, uninsured malpractice claim could deplete all of the assets of the debtor's practice. Under these circumstances, cancellation was not an ordinary transaction for Lavigne considering the risks he and his creditors were facing.

■■■ Under the horizontal test, a reasonable doctor in Lavigne's position, having ceased the conduct of his practice with the concomitant loss of the ability to raise revenue and facing a growing number of malpractice claims, would not have cancelled his medical malpractice insurance policy or foregone the option to buy Tail Coverage. As stated in *Waterfront*, "(s)ome transactions either by their size, nature or both are not

within the day-to-day operations of a business and are therefore extraordinary." *In re Waterfront,* 56 B.R. at 35. *See also, In re Drexel,* 157 B.R. at 537 (consent to modification of obligations of debtor fell outside scope of ordinary course of business transactions, and thus, notice and court approval required); *In re Anchorage Nautical Tours, Inc.,* 145 B.R. 637, 642 (9th Cir. BAP 1992) (debtor's surrender of major asset intended to generate revenues to fund debtor's business operations not done in ordinary course of business, and thus, notice and hearing required); *In re Media Central, Inc.,* 115 B.R. 119, 125 (Bankr.E.D.Tenn.1990) (post-petition severance agreements whereby debtor gave its management team one year's salary upon termination of employment not executed in ordinary course of business, and thus, court approval, after notice and hearing, required); *In re McDonald Bros. Const., Inc.,* 114 B.R. 989, 994 (Bankr.N.D.Ill.1990) (debtor's transfer of estate funds to professional was outside ordinary course of business, and thus, court approval, after notice and hearing, required). Under the circumstances of a high risk medical surgical practice, as set forth above, the act of cancellation coupled with the failure to take up the tail policy is a form of professional suicide.

As Lavigne's cancellation was not within the ordinary course of business and was ineffective, the Policy remained in effect as of the date of conversion to Chapter 7. The Court need not address the Trustee's alternative arguments in this regard.

*Section 365 of the Bankruptcy Code and the Trustee's Exercise of the Option*

█ The next issue to address is whether the Trustee is entitled to take up the Tail Coverage provided for under the Policy. The Policy provides, in Section IV titled "Optional Extended Reporting Period" that:

In the event of termination of this insurance by reason of non-renewal or cancellation by the ... Insured or if the Company shall cancel this policy or terminate it by refusing to renew, for reasons other than the Insured's non-payment of premium (unless the policy has been in effect for one year or more), then the ... Insured, upon payment of an additional premium ...

shall have the option to extend the period during which claims may be reported to the Company.... The premium to be paid for this Optional Extended Reporting Period Coverage shall be determined by the Company as of the aforementioned termination date, and a premium notice will be sent to the ... Insured or his or her legal representative. The ... Insured must inform the company in writing of his or her intent to purchase the Optional Extended Reporting Period Coverage within 60 days from the date of termination and must pay the premium therefor in full within that 60 day period or in three annual installments with an additional finance charge. Failure to so inform the Company within this 60 day period shall void the option to purchase the Optional Extended Reporting Period coverage provided in this section.

Additionally, the Policy provides in Section V titled "Regulatory Tail Period" that:

... the period for reporting claims ... shall be automatically (and without the payment of additional premium) extended for a period of 60 days if the insurance provided for by this policy is terminated by either the company or the ... insured, for whatever reason.

As an initial matter, the parties agree that the Trustee, following his appointment and conversion of the case, did not assume or reject the Policy or seek an extension of time to do so within the statutory period. As such, pursuant to section 365(d)(1), the Policy was deemed rejected sixty days after the conversion of the case; namely on March 28, 1994. The parties' dispute centers on the effect the deemed rejection had on the Policy and the Tail Coverage Option. MMIA argues that the deemed rejection effected a breach of the Policy and as such abrogated all rights under the Policy, relieving MMIA of the obligation to offer Tail Coverage to the Trustee. *See MMIA's Reply Memo of Law* at 10–11. The Trustee, on the other hand, argues that the deemed rejection of the Policy effected a termination of the Policy which, pursuant to Section IV of the Policy, gave rise to the sixty day option to purchase Tail Coverage ending May 27, 1994. *See Sur*

*Reply of the Trustee* at 15. The Trustee asserts that his May 3, 1994 letter was a proper and timely exercise of the option.

 Section 365 of the Code allows a Debtor or Trustee to determine whether to assume or reject prepetition contracts. Favorable prepetition contracts may be assumed, whereas prepetition contracts that are not in the best interest of the estate may be rejected. A decision to assume a contract requires the debtor to cure outstanding defaults and provide adequate assurance of future performance. A decision to reject a contract relieves the parties of their obligations under the contract. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo. L.Rev. 845, 931 (1988) ("Rejection is merely the antithesis of assumption in that '[i]t is the decision not to assume, not to obligate the estate on [a] contract or lease....' "). The debtor, by rejecting the contract, is considered to be in breach and the non-debtor party has a claim for damages. *See,* 11 U.S.C. § 365(g).

 Rejection, however, does not extinguish all rights under an executory contract. According to scholarly commentators:

> (r)ejection's effect is to give rise to a remedy in the non-debtor party for breach of the rejected contract, typically a right to money damages assertable as a general unsecured claim in the bankruptcy case.

*See* Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U.Colo.L.Rev. 1 (1991) (footnotes omitted); *See also* Jay L. Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.L.Rev. 227 (1989). State-law rights embodied within executory contracts survive rejection. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687 (Bankr.S.D.N.Y. 1992); *In re Independent American Real Estate, Inc.,* 146 B.R. 546 (Bankr.N.D.Tex. 1992); *In re South Motor Co. of Dade County,* 161 B.R. 532 (Bankr.S.D.Fla.1993); *In re Markey,* 144 B.R. 738 (Bankr.W.D.Mich. 1992); *In re Vertich,* 5 B.R. 684 (Bankr.S.D. 1980) ("rejection of the contract ... did not waive any interest in the property debtors had under equitable or state law as a result of the contract being terminated...."); *see, also,* Andrew at 931 ("Consistent with bankruptcy law's general deference to state-law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts."). Put another way, rejection does not dissolve, vaporize or otherwise make a contract disappear. *See Drexel,* 138 B.R. at 703.

*Statutory Obligation*

In the instant case, the Policy provided a right to purchase tail coverage upon termination of the contract by cancellation or non-renewal. Since Lavigne's cancellation was ineffective, the Policy was in effect upon conversion of the case. On March 28, 1994, the Policy was deemed rejected. Clearly this event ended the coverage that was in place. I do not find, however, that the rejection voided the Policy for purposes of the Tail Coverage or automatic reporting period. The determinative factor in this regard is the statutory and policy mandate imposed upon MMIA pursuant to New York Insurance law. As explained below, New York insurance law dictates that the option and reporting periods be made available upon termination of insurance *for purposes of protecting victims of medical malpractice.* The statutory obligation to offer Tail Coverage to the Trustee and an automatic reporting period for claimants is not eradicated by deemed rejection of the Policy.

MMIA was created in 1975 due to the withdrawal and threatened withdrawal of private insurance companies from New York State's medical malpractice market. *See Medical Malpractice Ins. Ass'n. v. Superintendent of Ins. of the State of New York,* 72 N.Y.2d 753, 757, 537 N.Y.S.2d 1, 533 N.E.2d 1030 (N.Y.1988); *cert. denied,* 490 U.S. 1080, 109 S.Ct. 2100, 104 L.Ed.2d 661 (U.S.N.Y. 1989); *Bleiler v. Bodnar,* 65 N.Y.2d 65, 68, 489 N.Y.S.2d 885, 479 N.E.2d 230 (N.Y.1985). The express purpose for creating MMIA was "to provide medical malpractice insurance no longer available in the voluntary market." *Bleiler,* 65 N.Y.2d at 68, 489 N.Y.S.2d 885, 479 N.E.2d 230. Governor Carey declared that "the purpose of the bill is to deal comprehensively with the critical threat to the health and welfare of the State as a result of

the lack of adequate medical malpractice insurance at reasonable rates." He stated further that the principal goal of the law was "to assure the prompt and fair disposition of medical malpractice claims." *Id.* at 68, 489 N.Y.S.2d 885, 479 N.E.2d 230 (citing Governor's Memorandum, 1975 McKinney's Session Laws of New York at 1739).

Under section 5504(f)(1) of the Insurance Law, MMIA is directed to issue policies as prescribed by the superintendent by regulation. Pursuant to Regulation 121 (the "Regulation"), MMIA is required to provide an option to purchase Tail Coverage under certain circumstances. Section 73.3 of the Regulation provides, in relevant part, that

 (c)(1) Upon termination of coverage, extended reporting period coverage ... must be available for any claims-made liability coverage provided under the policy; and

 (d) Upon termination of coverage, a 60–day automatic extended reporting period ... must be provided by the insurer.

It is clear to the court that MMIA's obligations pursuant to the above Regulation were set forth in sections IV and V of the Policy. Based upon the above Regulation, I find that the Tail Coverage option remained available to the Trustee and that his letter of May 6, 1994 was a valid and timely attempt to exercise it.

The statute also provides that in circumstances similar to those extant here MMIA must make insurance available to claimants. Section 73.3(n)(1) provides:

 (n)(1) A claims made policy issued to a corporation, partnership or other entity shall provide extended reporting period coverage upon termination of coverage to any person covered under the policy if:

 (i) such entity has been placed in liquidation or bankruptcy or permanently ceases operations;

 (ii) the entity or its designated trustee does not purchase extended reporting period coverage;

 (iii) such person requests the extended reporting period coverage within 120 days of the termination of coverage; and

 (iv) the coverage or risk is of the type enumerated in paragraph ... (10) [professional liability—including medical malpractice liability] ... of section 73.2(a) of this Part.

Consequently, not only is MMIA obligated to extend the option to the Trustee pursuant to 73.3(c)(1) above, MMIA is also required to provide coverage to claimants pursuant to 73.3(n). Clearly, the above provisions are part of a whole webbing of legislation from New York State which has perceived the necessity to protect not only doctors but, more importantly, malpractice claimants.

For all of the foregoing reasons the Court finds that Lavigne's cancellation of the Policy was use of estate property out of the ordinary course of business for which court authorization was required. The deemed rejection of the Policy gave rise to the Trustee's right to purchase Tail Coverage. The Court directs MMIA to notify the Trustee of the premium amount due for the extended coverage. In addition, MMIA has 30 days within which to file an administrative claim for unpaid premiums for coverage during the postpetition period.

Submit an order consistent with the foregoing.